**CIVIL ACTION NO. 08-484-DLB**

**LEIF HALVERSON**                                                                                  **PETITIONER**

**vs.**            **MEMORANDUM OPINION AND ORDER DENYING**
                   **PETITION FOR WRIT OF HABEAS CORPUS**

**THOMAS L. SIMPSON, Warden,**
**Kentucky State Penitentiary**                                                          **RESPONDENT**

*** *** *** ***

This matter is before the Court on Petitioner Leif Halverson's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

On July 22, 1983, a Kentucky state-court jury convicted Halvorsen on three counts of first-degree murder for the deaths of Joe Durrum, Jacqueline Greene and Joe Norman. The trial court sentenced Halverson to death for Durrum and Greene's murders and life imprisonment for Norman's murder. Kentucky state courts affirmed Halverson's convictions and sentences on direct appeal and denied him post-conviction relief. Halvorsen is currently incarcerated at the Kentucky State Penitentiary in Eddyville, Kentucky.

In his § 2254 petition, Halverson contends that he is being held in violation of the United States Constitution because of errors that occurred both during his trial and on appeal. Halverson does not argue that he is innocent. He argues that his constitutional rights were violated because of juror and prosecutorial misconduct, improper jury instructions, ineffective assistance of trial and appellate counsel, and improper sentencing.

1

Halverson's petition is fully briefed and ripe for review. For the following reasons, the Court will **deny** Halverson's habeas petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Trial in Fayette Circuit Court

On March 7, 1983, a Fayette County Grand Jury indicted Halvorsen, along with Mitchell Willoughby and Susan Hutchens, on three counts of intentional murder and two counts of robbery. The grand jury also charged Halverson and Hutchens with carrying a concealed weapon. Hutchens, who was present when the murders took place, pled guilty to two counts of hindering prosecution and testified at Halvorsen and Willoughby's joint trial. The trial took place in Fayette County Circuit Court with the Honorable Armand Angelucci presiding. The Kentucky Supreme Court provided the following factual summary:

> The bodies of Joe Norman and Joey Durrum were found on the side of the Brooklyn Bridge on the Jessamine-Mercer County line. The body of Jacqueline Greene was found in the Kentucky River below the bridge. Each of the victims had been shot to death. David Warner, who lived on the Jessamine County side of the Brooklyn Bridge, became suspicious when he noticed a light blue Ford van and a dark pickup truck lurking at various points around the bridge. At one point, the pickup truck parked on the bridge, a person got out of the passenger side, and Warner heard a big splash. Forty-five minutes later, Warner heard a noise that sounded like a car hitting a guardrail or a sign. He looked out to see the blue van and the pickup truck speeding off across the bridge toward Lexington. Warner called the police.

> When the police arrived, they found two of the victims on the side of the bridge, each bound with a blue-and-yellow rope that was attached to a heavy rock. The third victim was found in the river below the bridge, wrapped in a sheet that was also bound with a blue-and-yellow rope and attached to a heavy rock. A traffic sign near the bridge had been knocked over by a vehicle. It had paint smears on it and broken glass lying at its base.

> Officer William Foekele testified that around 1:30 p.m., on January 13, he was on Loudon Avenue in Lexington, looking for a car involved in another investigation, when he noticed a blue Ford van stopped at 215 Loudon Avenue. He wrote down the van's license number. On the following day,

police learned that two of the victims had lived in the house at 215 Loudon Avenue. A truck belonging to the third victim was found parked at the house. When police entered, they found blood at various places in the house.

Upon learning that a blue Ford van was seen in the area where the bodies were discovered, Officer Foekele suspected that it was the same vehicle which he had seen near the house at 215 Loudon the day before. A registration check revealed that the van was registered to Halvorsen. Foekele then went to Halvorsen's home but saw no vehicles in the driveway. A neighbor indicated that two men and a woman had just left in a blue pickup truck and would probably return shortly. Police staked out all routes to the house, located and cornered the truck, and demanded that its occupants exit. The driver, Mitchell, jumped out immediately. Halvorsen, after hesitating, slid out of the passenger side. The officers found a .38–caliber revolver where he had been sitting. As the officers approached the truck, the woman, Susan Hutchens, threw her hands up and said, "The gun's in my purse." A 9–millimeter pistol was found sticking out of her purse.

A ballistics expert positively identified several of the projectiles recovered from the victims' bodies as having come from the revolver and semi-automatic pistol found in the truck. Two 9–millimeter shell casings were additionally recovered at 215 Loudon. Fingerprints from both Willoughby and Hutchens were found on the 9–millimeter pistol. Hutchens' fingerprints were found on the refrigerator at 215 Loudon as well.

Also recovered from 215 Loudon, by the police, was a plastic blue-and-yellow rope identical to that found tied around the victims' bodies. Paint samples taken from Halvorsen's van matched the paint smears found on the highway sign near the bridge. A comparison between pieces of glass taken from a broken headlight on Halvorsen's van and pieces of broken headlight recovered from the base of the highway sign proved them to have come from the same headlight. Lastly, blood samples from Halvorsen's van were positively identified as having come from one of the victims.

At trial, Hutchens testified that in December 1982, she and Willoughby moved into the house at 215 Loudon, and Willoughby was employed by the victim, Joe Norman, to help him remodel the house. Willoughby and Hutchens moved out a month later when Norman refused to pay Willoughby for the work he had done.

Hutchens testified that on January 13 Willoughby and Halvorsen asked her to buy ammunition for their pistols. Later that day, she decided to go visit the victim, Jacqueline Greene, who lived at 215 Loudon with Joe Norman. When she arrived, Willoughby, Halvorsen, and Norman were standing in the driveway talking. Hutchens went into the house where Greene

introduced her to the victim, Joey Durrum. Willoughby, Halvorsen, and Norman then came inside when "all of a sudden" the shooting began.

Hutchens put her hands over her face, covering her eyes. She heard numerous shots. When the shooting was over, she opened her eyes to see Willoughby and Halvorsen each wielding a pistol. Norman and Durrum had fallen to the floor. Hutchens then saw Willoughby shoot Greene twice more, since she was still alive. Willoughby and Halvorsen then screamed at Hutchens to begin picking up the shell casings while they dragged the bodies of the victims through the hallway to the back door where they were placed in the van. Later, Halvorsen left in the van, and Willoughby left in the truck to get rid of the bodies.

*Halvorsen v. Commonwealth*, 730 S.W.2d 921, 922-23 (Ky. 1986).

The jury found Halverson guilty of all three murder charges and guilty of carrying a concealed weapon; the trial court granted a directed verdict on the robbery charge. Halvorsen testified at the penalty phase. During his testimony, Halvorsen admitted shooting two of the victims, but claimed he did so because of extreme intoxication and duress. On August 31, 1983, the trial court followed the jury's recommendation and sentenced Halvorsen to death for Durrum and Greene's murders and life imprisonment for Norman's murder.

## B. State court procedural history

### 1. Halvorsen's direct appeal to the Kentucky Supreme Court

Halvorsen appealed his conviction to the Kentucky Supreme Court, raising twenty-eight assignments of error. The court consolidated Halvorsen's appeal with Willoughby's. Two attorneys from the Kentucky Department of Public Advocacy represented Halvorsen. On December 18, 1986, the Kentucky Supreme Court affirmed Halvorsen's conviction and sentence. *Halvorsen*, 730 S.W.2d 921.

In denying Halvorsen's appeal, the Court held as follows: (1) the prosecutor did not commit reversible error by telling the jury its sentencing verdict was a "recommendation"; (2) the trial court's "combination" murder instruction did not violate due process or deprive Halvorsen of his right to a unanimous verdict; (3) the trial court did not err by choosing not to give a wanton murder instruction; (4) the prosecutor's closing argument during the penalty phase did not deprive Halvorsen of a fair trial; (5) the prosecutor's cross-examination of Willoughby did not result in comments about Halvorsen's decision not to testify; (6) the prosecutor did not introduce evidence of other crimes or bad acts that impermissibly prejudiced Halvorsen; (7) Halvorsen was not entitled to an instruction on extreme emotional disturbance; (8) the trial court properly instructed the jury on Halvorsen's intoxication defense; (9) the trial court was not required to *sua sponte* instruct the jury on nonstatutory mitigating factors; and (10) the trial court was not required to instruct the jury that Halvorsen's accomplice participation was a mitigating factor. *Id.* at 924-26. While the Kentucky Supreme Court did not provide an analysis for denying Halvorsen's other claims, it stated that it "reviewed the other assertions of error and are of the opinion none of them merits comment." *Id.* at 928.

The Kentucky Supreme Court denied Halvorsen's petition for rehearing. On November 30, 1987, Halverson's convictions and sentences became final when the United States Supreme Court denied Halverson's petition for a writ of certiorari. *Halvorsen v. Kentucky*, 484 U.S. 970 (1987).

## 2. Halvorsen's state court post-conviction relief proceedings

On February 8, 1988, Halvorsen filed a motion for post-conviction relief pursuant to Kentucky Rule of Criminal Procedure 11.42. Halvorsen's CR 11.42 Motion asserted that

he received ineffective assistance of counsel for the following reasons: (1) counsel failed to adequately investigate and present relevant evidence in support of his guilt/innocence phase defense; (2) counsel failed to obtain an adequate psychological evaluation; (3) counsel acted negligently by trying a capital case without a co-counsel; (4) counsel failed to adequately consult with Halvorsen in the presentation of his defense at both the guilt/innocence and penalty phases; (5) counsel's use of the word "recommendation" in reference to the jury's verdict; (6) counsel failed to adequately present mitigating evidence at the penalty phase; (7) counsel failed to adequately advise Halvorsen of the advantages/disadvantages of the testifying at trial; (8) counsel failed to adequately interview prosecution witnesses; (9) counsel failed to adequately prepare defense witnesses; (10) counsel failed to adequately cross-examine critical witnesses; (11) counsel created a conflict of interest by allowing a client, Comprehensive Care, to evaluate Halvorsen; (12) counsel failed to seek a change of venue despite pretrial publicity; (13) counsel failed to adequately conduct voir dire; (14) counsel failed to adequately present a motion for separate trials; (15) counsel failed to conduct an adequate motion practice; (16) counsel failed to adequately object to improper evidence and prosecutorial comments/questions; (17) counsel failed to adequately request jury instructions and failed to object to improper jury instructions; (18) counsel failed to challenge the composition of the Fayette County grand and petit jury pools; (19) counsel failed to object to the disproportionality of Halvorsen's death sentence; (20) counsel failed to object to the reciprocal use of mutually supporting aggravating factors; (21) counsel failed to object to defective and misleading verdict use in the penalty phase; and (22) counsel failed to request funds to conduct a study on the application of Kentucky's death penalty statute.

In addition to his ineffective assistance of counsel claims, Halvorsen argued that his following constitutional rights were violated: (1) his Eighth Amendment right to rational sentencing and right to be free from cruel and unusual punishment, as well as his Fourteenth Amendment right to due process by the jury's use of intoxication and possibility of parole as aggravating factors; (2) his Fourteenth Amendment right to be indicted and tried by a jury representing a fair cross-section of the community; (3) his due process and equal protection rights because the prosecutor sought capital punishment in a discriminatory and arbitrary fashion; (4) his due process right and right to be free from cruel and unusual punishment because the trial court failed to consider the disproportionality and arbitrariness of his death sentences; and (5) his due process right and right to be free from cruel and unusual punishment because the Kentucky Supreme Court improperly conducted its proportionality review.

The Commonwealth filed its response on March 2, 1988. Several events then delayed adjudication of Halvorsen's CR 11.42 motion. First, Halvorsen's initial counsel withdrew and new counsel was appointed.[1] Halvorsen then filed a motion to supplement his CR 11.42 motion, which the court granted in part and denied in part. Based on that ruling, the following arguments were added to Halverson's CR 11.42 motion: (1) counsel lessened the jury's responsibility by telling the jury that they were not going to be the ones to impose the death penalty because that is carried out by the Commonwealth; (2) ineffective assistance of counsel for failure to seek a change of venue because Halvorsen's

_____

[1] Halvorsen's initial counsel withdrew because they were employed by the Kentucky Department of Public Advocacy, and at the time of Halvorsen's appeal, his trial counsel was a state senator with influence over the DPA's funding. The DPA contracted two private attorneys to take over Halvorsen's case.

pretrial psychiatric evaluation was publicized; (3) additional arguments to buttress Halvorsen's ineffective assistance of counsel claim for failing to seek an independent psychological evaluation; (4) counsel failed to retain expert witnesses in a variety of fields; (5) counsel failed to go to the Commonwealth's office to look at evidence; (6) counsel failed to move for a separate trial given the conflict of interests between the two defendants; (7) the trial court failed to give a proper mitigation instruction in the penalty phase regarding accomplice liability.

On February 11-12, 1998, an evidentiary hearing was held on three issues: (1) whether counsel adequately investigated the case, interviewed witnesses, and consulted with experts; (2) whether counsel adequately advised Halvorsen on whether he should testify; and (3) whether counsel adequately discussed trial strategy with Halvorsen. Halvorsen's second set of co-counsel withdrew and a third set of co-counsel were appointed. Halvorsen filed a motion for an additional evidentiary hearing, which the court denied, and a motion to supplement the CR 11.42 hearing record, which the court granted. Issues related to funding for expert and investigative services also delayed the proceedings.

On October 30, 2002, the Fayette Circuit Court denied Halvorsen's CR 11.42 motion; a month later, it denied Halvorsen's CR 59.05 motion for reconsideration. Halvorsen appealed to the Kentucky Supreme Court. While that appeal was pending, Halvorsen filed a CR 60.02 motion in Fayette Circuit Court seeking relief from judgment. That motion raised two arguments: (1) jury misconduct because of the introduction of extraneous material into the jury room during capital sentencing deliberations, and (2) a First Amendment violation because a juror introduced Biblical passages into the trial.

On December 5, 2005, the Fayette Circuit Court denied Halverson's CR 60.02 motion as untimely; Halvorsen appealed. On August 23, 2007, the Kentucky Supreme Court issued separate opinions affirming the trial court's rulings on Halvorsen's CR 11.42 and CR 60.02 motions. *Halvorsen v. Commonwealth*, 258 S.W.3d 1 (Ky. 2007); *Halvorsen v. Commonwealth*, Nos. 2006-SC-000071-MR, 2006-SC-000100-MR, 2007 WL 2404461 (Ky. Aug. 23, 2007). The court denied a petition for rehearing.

### C.      Federal court procedural history

On August 18, 2009, Halvorsen, by counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. # 25). In his petition, Halverson does not argue that he is innocent. To quote Petitioner's brief "[t]he evidence that [Halverson] shot Durrum and Greene . . . was overwhelming." (Doc. # 25 at 146). This evidence included Hutchens's testimony that on the morning of the shooting Halverson asked her to purchase .38 hollow points for his handgun (TE 1736); Hutchens's testimony that Halverson was holding his .38 caliber handgun when the shooting stopped (TE 1745-46); the chief medical examiner and a forensic ballistics expert's testimony that established .38 caliber bullets from Halverson's gun caused fatal injuries to Durrum and Greene (TE 1303-38, 1517-54); and Glenda Tucker's testimony that on the day of the murders Halverson admitted killing three people (TE 1699).

In his petition, Halvorsen argues thirty (30) grounds for granting habeas relief;[2]

Claim 1:      The jury's consideration of Biblical scriptures while deliberating Halvorsen's guilt and also while deliberating whether to sentence Halvorsen to death deprived Halvorsen of the right to an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution

---

[2] The Court has preserved the language of Halverson's claims as he presents them in his petition.

Claim 2:      The jury's use of Biblical scriptures when deliberating on whether to sentence Halvorsen to death deprived Halvorsen of the right to heightened reliability in the appropriateness of the decision to impose the death penalty, the right to guided discretion in the sentencing determination, the right to an individualized sentencing determination based on a reasoned consideration of the aggravating and mitigating circumstances, and the right to a sentencing decision by a jury that does not believe final responsibility for the death penalty rests somewhere other than where authorized by law, all guaranteed by the Eighth Amendment to the United States Constitution

Claim 3:      The trial court's failure to excuse jurors who would hold it against Halvorsen if he did not testify, and whose ability to consider mitigating evidence and impose less than death was substantially impaired, violated Halvorsen's Sixth and Fourteenth Amendment right to a trial by an impartial jury at both the guilt and sentencing phase and his Eighth Amendment right to a trial before a jury that will "consider" and "give effect" to all proffered mitigating evidence

Claim 4:      The prosecutor's numerous improper comments during his guilt - or – innocence phase closing argument deprived Halvorsen of his Fifth and Fourteenth Amendments right to due process

Claim 5:      Halvorsen was denied his federal due process right to be informed of the nature of the charges against him, and thus was denied the ability to formulate a defense, when the trial court modified the charges against him by instructing the jury that it could convict him of intentional murder without finding that Halvorsen actually shot anyone, even though he was indicted only as the actual shooter

Claim 6:      Halvorsen was denied his right to due process under the Fourteenth Amendment to the United States Constitution when the trial court failed to instruct the jury on extreme emotional disturbance, thereby shifting the burden of proof on extreme emotional disturbance to the defense and allowing Halvorsen to be convicted, even though the prosecution did not prove an element of the offense - - absence of extreme emotional disturbance

Claim 7:      Halvorsen was denied his right to effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, when trial counsel failed to request: 1) an instruction on extreme emotional disturbance generally; and, 2) that the jury be instructed that it must find that the prosecution proved absence of extreme emotional disturbance beyond a reasonable doubt in order to convict Halvorsen of murder

Claim 8:     Kentucky's murder statute was unconstitutionally vague as applied to Halvorsen, in violation of the Fourteenth Amendment due process clause, because it failed to define extreme emotional disturbance

Claim 9:     Halvorsen was denied his Fourteenth Amendment due process right to a unanimous verdict, as guaranteed by the Kentucky Constitution, when the jury was allowed to and did convict Halvorsen under an instruction that did not require it to determine if Halvorsen acted as a principal or an accomplice

Claim 10:    The federal due process clause requires the prosecution to prove every element of the charged offense beyond a reasonable doubt. Halvorsen was denied this right when the trial court gave an accomplice instruction that allowed the jury to convict without finding the elements of accomplice liability, as defined by Kentucky law, had been proven

Claim 11:    Halvorsen was denied his right to due process under the Fourteenth Amendment to the United States Constitution when the jury was instructed on accomplice liability and convicted Halvorsen under possible accomplice liability despite insufficient evidence that Halvorsen acted as an accomplice

Claim 12:    Halvorsen was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel on direct appeal when direct appeal counsel failed to raise meritorious claims. Direct appeal counsels' deficient performance in failing to raise these claims also serves as cause to excuse any potential barrier to reviewing the underlying merits of claims not raised on direct appeal

Claim 13:    Halvorsen was denied his federal due process rights when he was convicted of intentional murder despite being insane at the time of the crime

Claim 14:    Trial counsel's failure to conduct a reasonable investigation of the facts of the crime and Halvorsen's mental health, including evidence of extreme emotional disturbance, that could have posed a defense to intentional murder or could have resulted in a conviction for a lesser sentence, and trial counsel's objectively unreasonable defense, deprived Halvorsen of the effective assistance of counsel at the guilt – or – innocence phase of his death penalty trial

Claim 15:    Halvorsen was denied his Fourteenth Amendment due process right to a fair trial when the prosecution elicited irrelevant and prejudicial other bad acts testimony that Halvorsen stomped on his children's kitten and when the prosecutor elicited testimony that Halvorsen threatened to kill his mother, if she found about the murders, and to throw her body off the same bridge Halvorsen was accused of throwing the victims' bodies off

11

Claim 16:      Halvorsen's Fourteenth Amendment due process right to a fair trial and his Fifth Amendment right to remain silent were violated when the prosecution used Halvorsen's codefendant to impermissibly comment on Halvorsen's refusal to testify

Claim 17:      The prosecutor's numerous and repetitive improper comments during his sentencing phase closing argument deprived Halvorsen of his Fifth and Fourteenth Amendment right to due process

Claim 18:      The prosecutor's improper comments during his sentencing phase closing argument deprived Halvorsen of his right to an individualized and reliable sentencing determination, as guaranteed by the Eighth Amendment to the United States Constitution

Claim 19:      Halvorsen was denied his Eighth Amendment and federal due process right to notice of information used to obtain a death sentence and the opportunity to rebut that evidence when the prosecutor argued future dangerousness as a basis to impose death, despite providing no notice that he would do so and despite not presenting any evidence of future dangerousness

Claim 20:      Halvorsen's death sentences violate the Eighth Amendment to the United States Constitution because no narrowing of death eligibility took place in his case and because the jury was allowed to sentence him to death without finding the existence of an aggravating circumstance enumerated under Kentucky law

Claim 21:      Halvorsen was denied his right to due process under the Fourteenth Amendment to the United States Constitution when the trial court erroneously instructed the jury on the sole statutory aggravating circumstance

Claim 22:      Halvorsen was denied his right to due process under the Fourteenth Amendment to the United States Constitution when he was sentenced to death despite insufficient evidence to support the sole statutory aggravating circumstance available under Kentucky law

Claim 23:      Halvorsen was denied his Fourteenth Amendment due process rights when he was forced to make the Hobson's choice of foregoing his constitutional right to present mitigating evidence of the lack of significant history of prior criminal activity in order to preserve the constitutional right to not have unrelated charges used against him

Claim 24:      Halvorsen was denied his Eighth and Fourteenth Amendment right to a reliable determination of whether he should be sentenced to death in a manner that does not tip the scales in favor of death by jury instructions that led the jury to believe less than death could be imposed only if the jury had

a reasonable doubt as to whether to impose a death sentence and that Halvorsen had the burden of proving less than death should be imposed

Claim 25:    Direct appeal counsel's failure to raise various sentencing phase issues on appeal deprived Halvorsen of his right to effective assistance of appellate counsel as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution. Direct appeal counsel's deficient performance also serves as cause to excuse any potential barrier to review of claims not raised on direct appeal

Claim 26:    Trial counsels' failure to investigate, develop, and present readily available mitigating evidence, including the effects of severe drug abuse and toxic chemicals on Halvorsen's brain, deprived Halvorsen of the effective assistance of counsel at the sentencing phase of his death penalty trial

Claim 27:    The Kentucky Supreme Court's failure to conduct meaningful proportionality review deprived Halvorsen of the Eighth Amendment right to procedures that lessen, or at least do not create, a substantial risk of arbitrary and capricious death sentences

Claim 28:    The manner in which the Kentucky Supreme Court conducts proportionality review in capital cases does not conform with the Fourteenth Amendment due process clause of the United States Constitution

Claim 29:    The Kentucky Supreme Court's refusal to disclose the data it has collected and relies upon in conducting its proportionality review of death sentences violates due process because it allowed Halvorsen's death sentences to be affirmed on evidence for which he had no opportunity to deny or explain

Claim 30:    The cumulative effect of the errors in this case rendered Halvorsen's trial fundamentally unfair in violation of his Fourteenth Amendment right to due process of law

By separate motion, Halvorsen attacks the constitutionality of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which governs the Court's review of his petition.  (Doc. # 27).

The Warden filed an answer/response, requesting that this Court deny Halvorsen's petition.  (Doc. # 58).  In accordance with the Court's order, the Warden also addressed Halverson's claim that AEDPA is unconstitutional.  (Doc. # 46).   Halvorsen filed his

reply/traverse to the Warden's response on March 14, 2011. (Doc. # 73). The parties have filed multiple supplemental briefs (Docs. # 112, 121, 122) and notices of authority (Docs. # 102, 117, 120, 124, 126, 127, 133, 147, 157, 158, 159, 160).

Halverson also filed several discovery-related motions during the pendency of this petition, which the Court will summarize briefly. On August 18, 2009, he filed a motion to authorize him to view sealed documents in possession of the Kentucky Attorney General's Office. (Doc. # 26). According to Halverson, these documents related to his argument that the post-conviction proceedings in Kentucky were unreliable due to insufficient funding. The Court denied that motion. (Doc. # 46). The Fayette Circuit Court did grant a similar motion that permitted Halverson to view and copy the documents. (Doc. # 45).

On June 15, 2011, Halverson filed three motions. The first motion sought to expand the record by including the following additional evidence: (1) affidavits in support of his ineffective assistance of direct appeal counsel claims (Claims 12 and 25); (2) affidavits in support of his claims relating to a lack of expert funding and his juror-Bible claims; (3) an affidavit on the standards of practice governing Kentucky capital cases at the time of Halvorsen's trial; (4) a custody evaluation report completed prior to Halverson's trial; and (5) material safety data sheets concerning chemicals Halverson was exposed to prior to the murders. (Doc. # 98). The Court granted the motion with respect to the affidavits related to Halverson's ineffective assistance of direct appeal counsel claims and denied the rest of the motion. (Doc. # 128).

The second motion sought the following discovery: (1) documents from the Fayette County or Estill County Commonwealth's Attorney's Office or from the Kentucky Attorney

General's Office relating to the murder of Charles Murray;[3] (2) documents from the Fayette County Police, the Kentucky State Police, the Fayette County Commonwealth's Attorney's Office, or the Kentucky Attorney General's Office, concerning Halverson's physical and mental condition from the date of his arrest until his trial commenced; and (3) permission to depose his trial counsel, the jurors at his trial, and his state post-conviction counsel. (Doc. # 99).  The Court denied Halvorsen's motion because he failed to demonstrate "good cause" necessary for the Court to permit discovery as is required by Habeas Rules 6(a) and (b).  (Doc. # 129).

The third motion requested an evidentiary hearing on the following issues: (1) the merits of nine (9) of his claims; (2) the effect of the state post-conviction trial court's denial of funding for expert assistance; (3) whether Claims 1 and 2 have been procedurally defaulted; and (4) further development of facts relevant to whether cause and prejudice exist to excuse any procedural default on fourteen (14) of his claims.  (Doc. # 100).  After analyzing the motion under the applicable habeas rules and case law, the Court denied relief.  (Doc. # 141).

On November 19, 2012, the Court ordered the parties to refrain from filing any further motions, citing the interests of judicial economy and the Court's efforts to adjudicate the merits.  (Doc. # 165).  The Court then ordered that Halverson's petition stood submitted.  *Id.*

---

[3]  Halverson was a suspect in Charles Murray's murder.  Murray, an acquaintance of Halverson's, was killed the night before Durrum, Greene and Norman.  Willoughby eventually plead guilty to first-degree manslaughter for Murray's death.

## II.  STANDARD OF REVIEW

Halverson filed his petition after AEDPA's effective date, and therefore AEDPA governs this Court's review.  AEDPA restricts a federal court's review of any claim that was "adjudicated on the merits in [s]tate court proceedings."  28 U.S.C. § 2254(d).  This limitation imposes a "highly deferential standard . . . and demands that state-court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted).  Under 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

However, if a petitioner presented a claim to the state courts and they did not adjudicate it on the merits, a court will apply *de novo* review.  *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007).  The decision reviewed is that of "the last state court to issue a reasoned opinion on the issue."  *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)).  The Kentucky Supreme Court was the last state court to issue a reasoned opinion on the claims presented in this petition.  *Halvorsen*, 730 S.W.2d 921; *Halverson*, 2007 WL 2404461; *Halvorsen*, 258 S.W.3d 1.

### A.  "Adjudicated on the merits"

Halvorsen attempts to limit the meaning of the term "adjudicated on the merits," and

thus subject his claims to *de novo* review. He claims that when there is doubt whether a state court adjudicated a claim, federal courts must presume the state did not. He further suggests that there is not an adjudication on the merits (1) if the state court did not issue a "reasoned opinion," (2) when a state court does not address a prong or subsection of a claim, and (3) when a state court examines only state law, and does not expressly address a defendant's federal constitutional claim.

After Halverson filed his petition, the United States Supreme Court rejected these arguments. In *Harrington v. Richter*, the Court held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to be 'adjudicated on the merits.'" 131 S.Ct. 770, 785 (2010). The Court reached its decision by noting that "[t]he statute refers only to a 'decision,' which resulted from an 'adjudication.'" *Id.* at 784. Thus, there does not need to be "an opinion from the state court explaining the state court's reasoning." *Id.* Further, a state court does not need to explain that it adjudicated a claim "on the merits." Rather, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. The presumption holds unless there is a contrary indication or a showing that "there is some other explanation for the state court's decision." *Id.* at 785. And when a state court rejects a claim, it does not need to analyze each element of the claim for there to be an adjudication on the merits, because "§ 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.* at 784.

The Supreme Court has also rejected Halvorsen's argument that there is not an adjudication on the merits when a state court examines state law and does not expressly address a defendant's federal constitutional claim. In *Johnson v. Williams*, the Supreme

Court held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." 133 S.Ct. 1088, 1096 (2013). The Court based its conclusion on its recognition that "it is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference." *Id.* at 1094. The Court then explained why state courts customarily do not discuss every claim a defendant raises: (1) state precedent at times fully incorporates a related federal constitutional right, and therefore the state court's discussion of state law is sufficient to cover the federal claim; (2) the defendant made only a fleeting reference to a Federal Constitutional provision insufficient to raise a federal claim; or (3) the federal claim is too insubstantial to merit discussion. *Id.* at 1094-95.

The presumption that a state adjudicated on the merits a rejected federal claim is not irrebuttable, but it is a "strong one," which can be overcome only in "unusual circumstances." *Id.* at 1096. To overcome the presumption, a petitioner typically must show that the state court "inadvertently overlooked" the federal claim. *See id.* at 1097. Absent that showing, this Court must presume that a rejected federal claim receives § 2254(d) deferential review.

## B.     Section 2254(d)(1)

Section 2254(d)(1) restricts a federal court's review of claimed legal errors. A federal court shall not grant habeas relief based on legal error unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Clearly established Federal law "refers to the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Yarborough v. Alvarado*, 541 U.S. 652, 660-661 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). It includes "not only bright-line rules but also the legal principles and standards flowing from precedent." *Mason v. Mitchell*, 543 F.3d 766, 772 (6th Cir. 2008).

While the "contrary to" and "unreasonable application of" prongs are similar, they require a distinct analysis. A state court decision is "contrary to" Supreme Court precedent when "the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[,]" or when "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 406-07.

A state court decision is an "unreasonable application of" Supreme Court precedent when a "state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). The state court's application of law "must be more than incorrect or erroneous"; it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). In other words, "[i]f fair minded jurists could disagree" about the state court's decision, habeas relief should not be issued. *Yarborough*, 541 U. S. at 664. Finally, a court must consider the rule's specificity: the more general the rule, the "more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*

C. **Section 2254(d)(2)**

Section 2254(d)(2) restricts a federal court's review of claimed factual errors. A habeas court may grant relief on a factual error claim only if the state court made "an

unreasonable determination of facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254. A "[s]tate-court's factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing § 2254(e)(1)). Because the state court's factual determination must be unreasonable, it is no matter that a "federal habeas court would have reached a different conclusion in the first instance . . . 'that does not suffice to supersede the trial court's . . . determination.'" *Wood v. Allen*, 558 U.S. 290, 309 (2010) (quoting *Rice*, 546 U.S. at 341-42). Even if the petitioner shows that the state court has made an unreasonable determination of fact, he still must show that the state court based its decision on that unreasonable determination before habeas relief is warranted. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

### III. AEDPA DOES NOT VIOLATE SEPARATION OF POWERS

Halverson argues that 28 U.S.C. § 2254(d)(1) is unconstitutional because it violates the separation of powers and operates as a suspension of the writ of habeas corpus. He contends that § 2254(d)(1) interferes with a federal court's duty to interpret the Constitution and usurps a federal court's jurisdiction to grant habeas relief. In Halverson's co-defendant's petition, this Court recently held that AEDPA does not violate separation of powers. *Willoughby v. Simpson*, No. 08-179-DLB, 2014 WL 4269115, *13 (E.D. Ky. Aug. 29, 2014). Because the Court's analysis in *Willoughby* is directly applicable to Halverson's claim, the Court will reference it below:

> Neither the Supreme Court nor the Sixth Circuit have addressed the constitutionality of § 2254(d) as amended by the AEDPA. When other circuits have considered the statute's constitutionality, they have uniformly upheld the law. *See Bonomelli v. Dinwiddie*, 339 F. App'x 384 (10th Cir. 2010); *Evans v. Thompson*, 518 F.3d 1 (1st Cir. 2008), *cert. denied*, 129

S.Ct. 255 (2008); *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007); *Mueller v. Angelone*, 181 F.3d 557 (4th Cir. 1999); *Green v. French*, 143 F.3d 865 (4th Cir. 1998), *overruled on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000); *Lindh v. Murphy*, 96 F.3d 856 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997). *But see Davis v. Straub*, 430 F.3d 281, 296-98 (6th Cir. 2005) (Merritt, J., dissenting).

\*\*\*   \*\*\*   \*\*\*   \*\*\*   \*\*\*

In *Bowling v. Parker*, 882 F. Supp. 2d 891 (2012), Judge Thapar, United States District Court Judge for the Eastern District of Kentucky, recently . . .found that § 2254(d)(1) did not violate the separation of powers. The court began with two important and related basic tenants of our federal system. First, state courts are capable interpreters of federal constitutional law, and are bound by the Supremacy Clause to "'guard and protect rights secured by the Constitution.'" *Id.* at 896 (*quoting Ex Parte Royall*, 117 U.S. 241, 251 (1886)). Second, lower federal courts derive their entire jurisdiction from statute, not Article III, and Congress is permitted to "expand or contract lower federal courts' power to grant habeas relief to state prisoners as it pleases." *Id.* at 897. The court then turned directly to whether § 2254(d) runs afoul of Article III.

Judge Thapar concluded that § 2254(d) does not violate Article III as it does not infringe on federal courts' independent judgment to determine whether a prisoner's constitutional rights were violated. *Id.* at 899. Rather, the statute serves to limit the information federal habeas courts may consider in exercising independent judgment, as well as limit the availability of the remedy. *Id.* More particularly, federal courts remain free to determine that a prisoner's right has been violated, however the court may only grant habeas relief in limited circumstances. *Id.* Each of these limitations are constitutional in Judge Thapar's determination. *Id.*

"[T]he Necessary and Proper Clause of Article I grants Congress the power to 'make laws for carrying into execution all judgments which the judicial department has power to pronounce.'" *Id.* at 898 (quoting *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 22 (1825) (Marshall, C.J.)). This clause allows Congress to limit the source of information that courts may consider in making its independent judgment, and also allows Congress to prescribe standards of review that courts must follow. *Id.* That same clause permits Congress to determine *when* a remedy is available for a violation of a constitutional right, though Congress may not dictate *how* courts interpret federal law nor compel a particular result. *Id.* at 899. Based on these considerations, Judge Thapar succinctly concluded that,

[u]nder § 2254(d)(1), federal courts still make independent

21

determinations of whether a petitioner's rights were violated, then look to Supreme Court precedent to decide whether they can grant relief. The statute limits remedies rather than mandating a rule of decision. As a result, § 2254(d)(1) does not run afoul of Article III.

*Id.*

Judge Thapar's well-reasoned conclusion in *Bowling* is consistent with all other circuits to consider the issue. As the Fourth Circuit held in *Green v. French*,

In amending section 2254(d)(1), Congress has simply adopted a choice of law rule that prospectively governs classes of habeas cases; it has not subjected final judgments to revision, nor has it dictated the judiciary's interpretation of governing law and mandated a particular result in any pending case. And amended section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy. Under the AEDPA, we are free, if we choose, to decide whether a habeas petitioner's conviction and sentence violate any constitutional rights. Section 2254(d) only places an additional restriction upon the scope of the habeas remedy in certain circumstances. As the Seventh Circuit pointed out in Lindh in great detail, such a limitation upon the scope of a remedy is entirely ordinary and unexceptionable, even when the remedy is one for constitutional rights. See *Lindh*, 96 F.3d at 870-73. Moreover, even if section 2254(d) does limit the interpretive power of the lower federal courts in some sense, that limitation is tantamount to other such choice of law limitations which are widely accepted and have never been thought to raise Article III problems. *See Lindh* at 870-73 (discussing non-constitutional contexts-such as res judicata, *Erie*, and federal court certification of state law issues-where federal courts are often bound by another tribunal's interpretation of law).

*Green v. French*, 143 F.3d 865, 874-75 (4th Cir. 1998) (internal citations omitted), *rev'd on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000). This Court agrees with Judge Thapar and all other circuits to decide the issue. Section 2254(d)(1) does not infringe on the court's independent judgment to determine whether a constitutional violation has occurred, but instead limits the court's ability to provide a remedy. This limitation does not breach the judiciary's independence. Ultimately, § 2254(d)(1) is constitutional.

*Willoughby*, 2014 WL 4269115, at *12-13.

Halverson also argues that § 2254(d)(1) operates as a suspension of the writ. Section 2254(d)'s plain language contradicts that argument. As the United States Supreme Court recently noted:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *It preserves authority to issue the writ* in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.

*Harrington*, 131 S.Ct. at 786 (emphasis added) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). That language in *Harrington* all but forecloses Halverson's argument. AEDPA preserves a federal court's ability to issue a writ of habeas corpus. 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State . . . ."). On a habeas petition, § 2254(d)(1) permissibly limits both the information a court can consider and the remedy available; it does not act as a suspension of the writ nor dictate that a court reach a certain result. Because § 2254(d)(1) is constitutional, this Court will apply it to Halverson's claims that the state court "adjudicated on the merits."

## IV. ANALYSIS

### Claims 1 and 2 - Juror misconduct

In his first set of claims (Claims 1 and 2), Halverson argues that he is entitled to habeas relief because the jury impermissibly used and relied on the Bible. Specifically, Halverson accuses Juror Garlington of incorporating the Bible into the jury's guilt and penalty phase deliberations. Halverson contends that the jury's conduct violated his Sixth Amendment right to an impartial jury. Further, he argues that it violated his Eighth

Amendment rights to (1) heightened reliability in the jury's decision to impose the death penalty, (2) guided discretion in the sentencing determination, (3) an individualized sentencing determination, and (4) a jury that does not believe final responsibility for the death penalty rests somewhere other than where the law authorizes. As relief, Halverson requests either a writ of habeas or an evidentiary hearing to determine the extent of the jury's use of the Bible and any prejudice that resulted. This Court has already denied Halverson's request to have an evidentiary hearing on Claims 1 and 2 because Halverson did not meet 28 U.S.C. § 2254(e)(2)'s requirements. (Doc. # 141). Therefore, this Opinion will discuss Claims 1 and 2 only as they relate to Halverson's request for habeas relief. Because Claims 1 and 2 are procedurally defaulted and Halverson has not established cause to excuse the default, the Court will not review them on the merits.

### A.    Applicable law

Under the procedural default doctrine, a federal court is generally barred from reviewing a petitioner's federal constitutional claim "if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004) (internal citations and quotation marks omitted). The Sixth Circuit uses a four-part test to determine whether a petitioner's claim is procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural ground is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim . . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must  demonstrate . . . that

there was cause for him not to follow the procedural rule and that he was
actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). In conducting this inquiry, a court

looks to the "'last explained state court judgment[]' to determine whether relief is barred on

procedural grounds." *Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011) (quoting *Muson*,

384 F.3d at 315).

### B. Halverson's claim is procedurally defaulted

In 2004, Halvorsen filed a CR 60.02 motion in Fayette Circuit Court raising the

issues presented in Claims 1 and 2. (Brief for Appellant, 06-SC-100 at 9-24). Under CR

60.02(f), a court may relieve a party from a final judgment for any "reason justifying relief,"

so long as the motion is made "within a reasonable time." The trial court has discretion to

determine whether a defendant filed the motion within a reasonable time. *Gross v.*

*Commonwealth*, 648 S.W.2d 853, 858 (Ky. 1983). The Fayette County Circuit Court denied

Halverson's motion because he did not file it timely, and the Kentucky Supreme Court

affirmed. *Halverson*, 2007 WL 2404461, at *1.

Halverson argues that Claims 1 and 2 are not procedurally defaulted because the

Kentucky Supreme Court incorrectly upheld the trial court's ruling that he did not file his CR

60.02 motion within a "reasonable time." Halverson asserts that he filed his motion within

a reasonable time because he filed it within one year of discovering the facts that

formulated the basis for his claim. Specifically, Halverson contends that 2003 was the first

time that he could have discovered the Bible's alleged during deliberations, "when Juror

Garlington . . . admitted that he carried a Bible with him at all times during the trial –

including in the deliberation room – and that he prayed with the jurors daily during the trial."

(Doc. # 25 at 78).  By arguing that the Kentucky Supreme Court erred in ruling that he did not file his motion within a "reasonable time," Halverson asserts that there is not an adequate and independent basis for the state court's decision.

The Kentucky Supreme Court held that Halverson did not file his motion timely for three reasons.  First, Halverson filed his motion "over twenty years after the trial," which is "prima facie evidence to support the trial court's conclusion that Halvorsen's . . . motion[] [was] not, in fact, filed within a reasonable time."  *Halverson*, 2007 WL 2404461, at *2. Second, the Court rejected Halverson's argument that he could not have learned of any alleged impropriety until 2003:

> Halvorsen and Willoughby contend that they were unable to make their allegations regarding Juror Garlington's alleged misconduct sooner because they did not learn of it until November 2003 when Garlington agreed to be interviewed by the DPA investigator. It is uncontested that the trial court gave permission for the jurors to be interviewed in 1985. At that time, many of the jurors refused to be interviewed; but two jurors were actually interviewed. And Juror Garlington's strong religious views surfaced during the trial, as is plainly evident from the astonishing fact that the trial court allowed Garlington to lead the courtroom in prayer at the conclusion of the case. So through due diligence and proper questioning, Halvorsen and Willoughby could have learned of any alleged jury misconduct approximately twenty years before they filed their CR 60.02 motion.

*Id.*  Third, the Court recognized that Kentucky courts often deny CR 60.02 motions that are filed sooner after trial than Halverson's.  *Id.* at *3.

The Kentucky Supreme Court's decision denying Halverson's CR 60.02 motion as untimely is an adequate and independent basis for its judgment.  A state procedural rule can serve as an adequate and independent basis for a state-court decision if it is "firmly established and regularly followed."  *Walker v. Martin*, 131 S.Ct. 1120, 1127-28 (2011) (internal citation omitted).   As the Kentucky Supreme Court noted, Kentucky courts

routinely reject CR 60.02 motions due to defendants not filing them within a reasonable time. *Willoughby,* 2007 WL 2404461, at *3 (citing *Gross*, 648 S.W.2d at 858, which held that the trial court did not abuse its discretion in finding that a CR 60.02 motion filed five years after conviction was not filed in a reasonable time); *see also Commonwealth v. Carneal*, 274 S.W.3d 420, 433 (Ky. 2008) (finding no abuse of discretion in trial court's decision to deny CR 60.02 motion as untimely when it was filed five years after judgment was entered); *Stoker v. Commonwealth*, 289 S.W.3d 592, 597 (Ky. App. 2009) (ruling that a CR 60.02 motion filed eighteen years after conviction was not filed in reasonable time); *Reyna v. Commonwealth*, 217 S.W.3d 274, 276 (Ky. App. 2007) (holding that a defendant's CR 60.02 motion filed four years after he entered a guilty plea was not filed timely). Thus, the state court's ruling in this case that Halverson did not file his motion timely is "firmly established and regularly followed" in Kentucky, and therefore the ruling serves as an adequate and independent basis for the state court's judgment.

Reviewing the record shows that the first three factors for procedural default are met: (1) Halverson failed to comply with a state procedural rule, (2) the state courts actually enforced the CR 60.02 timeliness requirement, and (3) CR 60.02 is an "adequate and independent" basis for the state-court's decision. Therefore, unless Halverson can show "cause" for not following the state procedural rule, this Court is foreclosed from reviewing Claims 1 and 2 on the merits.

### C. Halverson has not established cause for his procedural default

Cause for a procedural default exists when a petitioner "can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner can show the

impediment by demonstrating "that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Id.* (internal citations and quotation marks omitted).

Halverson argues that there is cause to excuse procedural default for Claims 1 and 2 because he was not able to conduct effective juror interviews prior to 2003. Halverson suggests that he was not able to effectively interview jurors because some of the jurors declined to be interviewed, those that were interviewed did not mention the Bible's use during deliberations, and local rules prevented him from interviewing jurors.

Halverson's arguments are unavailing. The trial court gave Halverson permission to interview the jurors in 1985. *Halverson,* 2007 WL 2404461, at *2. But as the Kentucky Supreme Court noted, "[a]fter trial, a juror is under no obligation to discuss his or her jury service with either the Commonwealth or defense." *Id.* Many jurors exercised their right to refuse an interview, but two granted interview requests. *Id.* Thus, it is inconsequential that a local rule impeded Halverson from interviewing jurors. And if the jurors who were interviewed did not mention the Bible's alleged use, it could be because Halverson's counsel never asked the question, because the jurors thought it too insignificant to mention, or because the Bible played no role during their deliberations. Either way, there was no "interference by officials [that] made compliance impracticable." *See Murray*, 477 U.S. at 488.

Further, as noted the Kentucky Supreme Court noted, Halverson could have discovered the basis for the jury misconduct claim from Juror Garlington's conduct at trial. *Halverson*, 2007 WL 2404461, at *2. During voir dire, Juror Garlington made known that he was a pastor and shared his religious views. In response to being asked whether he

ever debated against the death penalty, Garlington responded:

> The Bible says if you live by the sword you'll die by the sword. Now the Bible also says that if a man – no man can take his life but Christ. Now if a man hasn't been saved, he's already committed himself. If a man is saved, then it doesn't matter, because he's with the Lord. Now if a man has done accepted Christ and he does wrong, he should be judged by the system. You follow what I'm saying.

(TE 367). He then went on to explain:

> If he done wrong, then he should pay. As far as the death penalty, that's him and the federal government or whatever the case may be; if he's done wrong and he's found guilty and the facts prove it, then I have to vote that man gets the penalty, whatever it is.

(*Id.*). Garlington also expressed his religious views at the conclusion of trial:

> Let's all just bow our heads. Just for a moment for truly we all have been through a trying situation and we can see from our standpoint that justice has been done, and we want to say to you, *we want to say to God that we appreciate him coming into our midst and guiding us all.* We want to thank God for this.

(TE 2621) (emphasis added). As the record demonstrates, the first time Halverson could have discovered the facts to support Claims 1 and 2 was not in 2003, but during his trial. Halverson has not demonstrated cause for the procedural default of Claims 1 and 2; therefore, Claims 1 and 2 are procedurally defaulted.

### Claim 3 - The trial court's decision not to excuse three jurors for cause

In Claim 3, Halverson contends that the trial court's failure to excuse three jurors for cause violated his Sixth Amendment right to trial by an impartial jury and his Eight Amendment right to a jury that would consider and give effect to all mitigating evidence. As relief, Halverson asks for a new trial or a new sentencing phase. Because two of the jurors did not sit on the jury and because the trial court's decision not to excuse the third juror was reasonable, Claim 3 is denied.

29

### A.    State court decision

Halverson raised this claim on direct appeal.  (Brief for Appellant, 84-SC-39 at 49-58).  The Kentucky Supreme Court rejected the claim when it stated "[w]e have reviewed the other assertions of error and are of the opinion none of them merits comment." *Halvorsen*, 730 S.W.2d at 928.  Halverson concedes that he cannot overcome the presumption that a when a state court rejects a federal claim the claim has been adjudicated on the merits.  (Doc. # 73 at 95).  Thus, in order for this Court to grant habeas relief on Claim 3, Halverson must demonstrate that the state court's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established" Supreme Court law.  28 U.S.C. § 2254(d).

### B.    Applicable law

The Sixth Amendment guarantees a defendant a jury that "will consider and decide the facts impartially and conscientiously apply the law as charged by the court."  *Adams v. Texas*, 448 U.S. 38, 45 (1980).  To be impartial, a juror must be able to follow the law. *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).  A trial judge does not have to be right in determining that a juror is impartial, his decision just has to be "fairly supported by the record."  *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003) (citing *Witt*, 469 U.S. at 433) (internal citation and quotation marks omitted).

### 1.    Jurors Ogden and Distler

Halverson argues that the trial court should have excused Juror Ogden for cause because Ogden's responses during voir dire demonstrated that Ogden would hold it against Halverson if he did not testify.  Halverson contends that the trial court should have excused Juror Distler for cause because she said in voir dire that illegal drug use would negatively

impact her impartiality and that most violent crimes deserve the death penalty.

Halverson's claims with respect to Ogden and Distler fail because neither sat on the jury; Halverson dismissed both by exercising his peremptory challenges. If the jury that is ultimately impaneled is impartial, "the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). A court deciding whether a jury was impartial looks only to "the jurors who ultimately sat." *Id.* at 86. Because Ogden and Distler did not sit on the jury, the trial court's decision not to strike them for cause is irrelevant to Halverson's Sixth Amendment claim.

Halverson argues that *Ross* doesn't apply, because under Kentucky law he is entitled to relief for using a peremptory challenge to excuse a juror that the trial court should have excused for cause. However, on habeas review, the issue is not whether Kentucky law warranted reversing Halverson's conviction, but whether he is being held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The Sixth Circuit has not recognized an exception to *Ross* for habeas claims arising in Kentucky. In *Bowling v. Parker*, a petitioner convicted in Kentucky state court brought a habeas claim because he used three peremptory challenges on jurors that he argued the trial court should have dismissed for cause. 344 F.3d at 519. In rejecting the petitioner's claim, the Sixth Circuit cited *Ross* for its holding that there was "no constitutional violation here." *Id.* at 521. Likewise, Halverson's argument that he had to use a preemptory challenge on Ogden and Distler fails to raise a constitutional issue.

### 2.      Juror Garlington

Halverson argues that the trial court should have dismissed Garlington for cause because he made statements during voir dire that showed his inability to impose less than the death penalty.  Specifically, Halverson points to Garlington's answer when asked in which type of case he would impose the death penalty: "[B]rutal murder.  By God, just walk up and just shoot somebody, you know and kill him."  (TE 373).

A court should excuse a juror for cause when his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Adams*, 448 U.S. 38 at 45.  Because the Kentucky Supreme Court adjudicated this claim on the merits, this Court can grant relief only if the Kentucky Supreme Court's judgment that Garlington was impartial "involved an unreasonable application of clearly established" Supreme Court law.  28 U.S.C. § 2254(d).

The Kentucky Supreme Court was not objectively unreasonable when it affirmed the trial court's decision not to excuse Garlington for cause.  While Garlington made statements that called into question his ability to serve on the jury, he also made statements from which the Kentucky Supreme Court could reasonably conclude that he was an impartial juror.  Garlington stated that he would not automatically vote for the death penalty, he would consider voting for a sentence of twenty years to life in prison, and he would consider mitigation and justification.  (TE 365, 368-69, 372, 381-82).  These statements all cut against Halverson's argument that Garlington was unable to impose less than the death penalty.  Under § 2254(d)'s circumscribed standard of review, this Court rejects Halverson's claim that Juror Garlington should have been dismissed for cause.

## Claim 4 - Prosecutorial Misconduct

In Claim 4, Halverson argues that he is entitled to relief because the prosecutor made comments during the guilt phase that deprived him of due process. Halverson specifically points to the following: (1) the prosecutor's comments regarding the robbery charge; (2) the prosecutor's statement that the Commonwealth gave the jury all the evidence that it could; (3) the prosecutor alluding to other crimes and bad acts; and (4) the prosecutor's statements on how the bullets entered the victims' bodies. Because the Kentucky Supreme Court was not objectively unreasonable in determining that these comments did not deprive Halverson of a fair trial, Claim 4 is denied.

### A.    State court decision

Halverson raised prosecutorial misconduct on direct appeal. (Brief for Appellant, 84-SC-39 at 132-38). The Kentucky Supreme Court denied the claim when it stated "[w]e have reviewed the other assertions of error and are of the opinion none of them merits comment." *Halvorsen*, 730 S.W.2d at 928. Because the state court rejected the claim, there is a presumption the state court adjudicated it on the merits. *Harrington*, 131 S.Ct. at 785. Halverson argues that he can overcome that presumption because it is more likely that the state court did not decide the claim on its federal merits. Halverson points out that the Kentucky Supreme Court analyzed his arguments about improper comments during the sentencing phase, but not his arguments about improper comments during the guilt phase. Further, Halverson states that because the Kentucky Supreme Court cited only state law in denying his sentencing phase claim, it must have relied only on state law in addressing his guilt phase claim.

As discussed above, after Halverson filed his petition and reply, the United States Supreme Court addressed nearly this exact argument and rejected it. In *Johnson v. Williams*, the Supreme Court held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." 133 S.Ct. at 1096. This presumption is a "strong one," which can be overcome only in "unusual circumstances." *Id.* And if state law "is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits." *Id.*

Halverson has not overcome the strong presumption that the Kentucky Supreme Court adjudicated on the merits his claim of prosecutorial misconduct during the guilt phase. A review of Kentucky Supreme Court cases around the time that the court rejected Halverson's appeal shows that Kentucky followed United States Supreme Court law in evaluating prosecutorial misconduct claims. *See Slaughter v. Commonwealth*, 744 S.W.2d 407, 411-12 (Ky. 1987) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), in analyzing a claim of prosecutorial misconduct during closing arguments); *Smith v. Commonwealth*, 734 S.W.2d 437, 445 (Ky. 1987) (citing *Smith v. Phillips*, 445 U.S. 209 (1982), in addressing a prosecutorial misconduct claim). Because Kentucky state law was "at least as protective as the federal standard," Halverson's claim of prosecutorial misconduct during the guilt phase "may be regarded as having been adjudicated on the merits." *See Johnson*, 133 S.Ct. at 1096. Therefore, Halverson must demonstrate that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established" Supreme Court law. 28 U.S.C. § 2254(d).

**B.    Applicable law**

A prosecutor's comments do not infringe on a defendant's constitutional rights when they are "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted).  Rather, they must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. A prosecutor's comments render a trial fundamentally unfair and deny a defendant due process when they likely have "a bearing on the outcome of the trial in light of the strength of the competent proof of guilt." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citing *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)).

The Sixth Circuit uses a two-part test to determine whether a prosecutor's comments deprived a defendant of due process. *Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013). First, a court determines whether the comments were improper. *Id.*  If they were, the Court considers four factors to decide if the comments were flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally made, and (4) the total strength of the evidence against the defendant." *Id.* (quoting *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005)).

**C.    Analysis**

**1.    Robbery charge comment**

Halverson argues that the prosecutor improperly told the jury that Halverson was guilty of robbery, despite the trial judge granting a directed verdict on that issue.  Halverson states that in doing so the prosecutor expressed his personal opinion, made statements that had no basis in the record, and argued Halverson was guilty of an offense despite

knowing that the evidence did not support guilt.

The Court must view the prosecutor's comments in the context of the entire record. *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004) ("In examining prosecutorial misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole."). The grand jury indicted Halverson for robbery. Although Hutchens testified that she searched and took property from the victims after Halvorsen and Willoughby stopped shooting, Kentucky law does not allow one to be found guilty of robbery for taking property from a corpse. Accordingly, the trial court granted a directed verdict for Halverson.

Reviewing the record it is clear that the prosecutor's comments about the robbery charge were made to rebut arguments made by defense counsel. During closing arguments, Willoughby's counsel was the first to bring up the robbery charge:

> Well now when we started this case, there were six charges presented to you that were going to be proven beyond all doubt. Ladies and gentlemen, you heard the Judge say that he'd dismissed two of those charged, because there just wasn't evidence to substantiate it. They're gone. They not only cannot be proven to you beyond all doubt, they didn't even meet the first standard. *Does that, therefore, mean you need to ask a question about the rest of the charges?*

(TE 2239-40) (emphasis added). The prosecutor responded to defense counsel by stating the following:

> Since Mr. Maloney brought it up, I want to mention about the robbery charge, which is no longer before you, because he implied to you or suggested to you that because I said that we would prove this robbery beyond any doubt and that isn't before you, that somehow you've got to question this entire case. Well ladies and gentlemen, I told you that the case would be proven to you because it would be shown that the defendants took the personal property of the victims and they did, and when I say they I – I include these defendants and I include Susan Hutchens, who's a defendant in this case, although not here today, and they did take it.

Well, in some of these legal things that go on in the court – in the court proceeding, the Judge decides – decided that that is not robbery, because it wasn't proven that that happed before they were killed as opposed to after they were killed. We may have a difference of opinion, but that's not the point. The point is that it was proven to you the facts. It was proven to you that they took the property and that was proven to you beyond all doubt. Now if there is a discrepancy about the law of robbery, it really isn't relevant to whether or not this case of murder is proven to you beyond any doubt.

(TE 2256-57). As evidenced by the transcript, defense counsel brought up the directed verdict on the robbery charge to cast doubt on the remaining charges; the prosecutor's comments about the robbery charge were made to rebut that argument.

When considered in this context, the prosecutor's statements were proper – and they certainly did not rise to the level of rendering the trial unfair. A prosecutor has "'wide latitude' during closing argument to respond to the defense's strategies, evidence and argument." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)). Here, the prosecutor's comments about the robbery charge were in response to defense counsel's argument that the directed verdict on the robbery charge meant that the jury "need[ed] to ask a question about the rest of the charges." (TE 2240). The prosecutor's response pointed out that to establish the robbery charge he had to prove that the defendants took property from the victims, that the court decided that there was not a robbery because the victims were dead when the property was taken, and that the directed verdict on the robbery charge had no bearing on the murder charge. All of these statements were true, isolated, and would have clarified rather than confused the jury. And considering the strength of the evidence in this case, it is not rational to think that these statements had any bearing on the jury's verdict. Thus, the Kentucky Supreme Court's denial of this claim was reasonable.

## 2.    Trial by innuendo

Halverson argues that the prosecutor impermissibly suggested additional evidence of guilt by telling the jury  "we gave you all the proof . . . that we could give to you."  (TE 2254).  He suggests that this comment establishes prosecutorial misconduct that violated his due process rights.

Like the prosecutor's statements about the robbery charge, this comment was proper when viewed in context.  *See United States v. Wells*, 623 F.3d 332, 338 (6th Cir. 2010) (holding that a prosecutor's comments must be considered in proper context to determine whether they were likely to mislead the jury).  Below is the prosecutor's statement in full:

> We put on a lot of proof in this case, a lot of it which now Mr. Jarrell can call window dressing, because it may not seem necessary in light of the fact that Mitchell Willoughby has now testified and given us some additional insight into what went on.  But we didn't rely on that happening; We didn't figure he was going to do that; We didn't know what he was going to say.  So we gave you all the proof that there was, all the proof that is that we could – that we could give to you.

(TE 2254).   Rather that suggesting additional evidence of guilt, the prosecutor was apparently explaining why the Commonwealth put on the evidence that it did and why its evidence differed from Willoughby's testimony: "we didn't rely on [Willoughby testifying]; . . . [w]e didn't know what he was going to say."  *Id.*  Like the robbery charge, this comment was isolated, true and clarified for the jury why the prosecutor put on certain evidence.  And again, the evidence of Halverson's guilt was overwhelming.  Thus, it was not unreasonable for the Kentucky Supreme Court to conclude that this comment did not affect the trial's outcome.

### 3.    Comment on other crimes

Halverson claims that the prosecutor suggested that he committed other crimes for which he was not charged.  Specifically, Halverson points to the following question the prosecutor posed to the jury: "to what extent did they [Halverson and Willoughby] have to go to come up with the drugs?"  (TE 2257).

Viewed in the context of the trial, this statement was not improper and certainly did not render the trial fundamentally unfair.  The prosecutor's comment was a response to Halverson and Willoughby's trial strategy.  Throughout the trial, Halverson and Willoughby highlighted their drug use leading up to the murders.  Both defense attorneys used the drug use as part of their defense in closing arguments.  (TE 2223-24, 2239-40).  Willoughby testified extensively on the drug use.  (TE 1922-26).  During his testimony, Willoughby admitted that he regularly carried a gun because some of the "dope dealers" he purchased from were "pretty shady characters."  (TE 1922).  Because the defendants introduced evidence of their drug use and used that drug use as part of their trial strategy, any comment on it was proper.  *See Bedford,* 567 F.3d at 233 (holding that the prosecution is allowed to respond to the defense's strategies and evidence).  The prosecutor's question, "to what extent did they [Halverson and Willoughby] have to go to come up with the drugs?," was a fair response to Willoughby's testimony that his dealings with "shady" dope dealers caused him to carry a gun when he made drug purchases.  Further, the prosecutor's comment was isolated, and as has been discussed, the evidence of Halverson's guilt was overwhelming.  Therefore, it was reasonable for the Kentucky Supreme Court to conclude that  it did not affect the outcome of the trial.

### 4.    The prosecutor's comments about the gunshot wounds

Halverson argues that the prosecutor impermissibly discussed how Halverson and Willoughby inflicted the gunshot wounds. He asserts that the prosecutor's comments were unsupported personal opinion because they were not based on testimony. Halverson takes issue with the prosecutor opining on the order Halverson and Willoughby fired the shots.

Halverson's arguments do not stand up to the record. During closing argument, counsel is permitted to discuss the evidence and is given considerable leeway to draw "reasonable inferences" therefrom. *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996). Hutchens testified as to where Halverson and Willoughby were in relation to the victims before they fired the shots. (TE 1709-51). The medical examiner, Dr. Greg Nichols, testified to the location of the entrance and exit wounds, the trajectory of the bullets, which shots were lethal, and whether the wounds were pre- or postmortem. (TE 1298-1339). The prosecutor made clear that he was suggesting, not telling, the jury the order in which Halverson and Willoughby fired the shots. He told the jury the following: "this wound is *probably* shot first . . . the first shot . . . is *probably* . . . number three." (TE 2281-82). The prosecutor's inferences about the order in which Halverson and Willoughby fired the shots were proper and reasonable based on Dr. Nichols and Hutchens's testimony. Accordingly, it was reasonable for the Kentucky Supreme Court to deny this claim.

### Claim 5 - Failure to indict as an accomplice

In Claim 5, Halverson argues – for the first time in any court – that the Commonwealth violated his due process right to be informed of the nature of the charges against him. Specifically, Halverson asserts that he was denied due process when the trial court instructed the jury that he could be found guilty of murder as an accomplice, when the

grand jury indicted him only as a principal. Because Halverson did not raise this argument in state court and has not established cause for the default, Claim 5 is denied.

### A.    Procedural default

To properly assert a federal claim in a habeas petition, a petitioner must first have exhausted state remedies by presenting the claim to the state courts. *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009). To "fairly present" a claim to the state courts the petitioner must have "asserted both the factual and legal basis for the claim[]." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (citing *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987)). If the petitioner did not present the claim to the state court, but a state procedural rule now prohibits the state court from considering it, the claim is procedurally defaulted. *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991)). Procedural default bars federal court review of the claim, "unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or that failing to review the claim would result in a fundamental miscarriage of justice." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

Halverson concedes that he "never presented [Claim 5] in state court," (Doc. # 73 at 106), and that "[t]his claim is exhausted by virtue of the fact that no avenue remains to present it in state court," (Doc. # 25 at 122). This Court agrees that state procedural rules now bar Halverson from presenting this, and all claims in this petition, to the Kentucky state courts. CR 12.04(b) (an appeal must be filed within thirty days after entry of judgment); CR 11.42(10) (motion for post-conviction relief must be filed within "three years after the judgment becomes final."); CR 60.02 (motion for relief from judgment must be filed "within a reasonable time."). Therefore, unless Halverson can demonstrate cause, Claim 5 is

procedurally defaulted.

**B.    Cause for procedural default**

To demonstrate cause, Halverson's argues that his appellate counsel was ineffective for not raising claim 5 on direct appeal.  Ineffective assistance of appellate counsel can constitute cause.  *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)).  Halverson did not raise ineffective assistance of appellate counsel in state court.  His failure to raise that claim would normally result in procedural default and foreclose him from relying on it as a means to demonstrate cause for his failure to raise *this* claim.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted").  However, at the time of Halverson's post-conviction proceeding, Kentucky did not recognize ineffective assistance of appellate counsel claims.  *Boykin v. Webb*, 541 F.3d 638, 647 (6th Cir. 2008) (citing *Bowling v. Commonwealth*, 80 S.W.3d 405, 421 (Ky. 2002)).  Therefore, the Sixth Circuit has held that federal courts should address a Kentucky prisoner's ineffective assistance of appellate counsel claim even if he did not raise it in state court.  *Boykin*, 541 F.3d at 648.  AEDPA also directs this Court to consider Halverson's ineffective assistance of appellate counsel claim.  28 U.S.C. § 2254(b)(1)(B)(I) (stating that a court may grant habeas relief despite an applicant's failure to exhaust state remedies if "there is an absence of available State corrective process.").

To resolve whether Halverson has established cause for his procedural default of Claim 5, this Court must determine whether Halverson's appellate counsel was ineffective for failing to raise claim 5.  *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003).  If counsel's

performance was not constitutionally ineffective, there is no cause. *Id.* Determining whether Halverson's appellate counsel was ineffective requires the Court to analyze Claim 5's merits. *Id.* Because the state did not adjudicate Claim 5 on the merits, *de novo* review applies. *Werth v. Bell*, 692 F.3d 486, 493 (6th Cir. 2012).

### 1. Ineffective appellate counsel standard

The standard for evaluating a claim for ineffective assistance of appellate counsel is the two-prong *Strickland* standard. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). First, a petitioner must demonstrate that his counsel's performance was deficient. *Id.* Courts apply a "strong presumption" appellate counsel provided effective representation. *Harrington*, 131 S.Ct. at 787 (internal citations and quotation marks omitted). To prove deficient performance, a petitioner must show "that his counsel was objectively unreasonable, in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith*, 528 U.S. at 285. Appellant counsel is permitted to select from claims "in order to maximize the likelihood of success on appeal." *Id.* at 288. This means that only when "ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (citation omitted).

Second, a petitioner must establish that he was prejudiced by his counsel's deficient performance, which requires showing "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal." *Id.* at 285-86 (citing *Strickland*, 466 U.S. at 694). For Halverson to show a reasonable probability that he would have prevailed on his appeal, he must demonstrate that the "likelihood of a different result . . . [is] substantial, not just conceivable." *Harrington*, 131 S.Ct. at 792.

43

## 2.     Analysis

To demonstrate ineffective assistance of appellate counsel, Halverson must establish both deficient performance and prejudice. *Allen v. Harry*, 497 F. App'x 473, 481 (6th Cir. 2012). Therefore, if this Court finds that Halverson has not demonstrated one prong, it need not address the other. *Id.* Even assuming *arguendo* that Halverson's appellate counsel was unreasonable for not arguing that Halverson was not informed of the nature of the charges against him, Halverson has not demonstrated that this decision prejudiced him.

The Commonwealth indicted Halverson, along with Willoughby and Hutchens, on three counts of intentional murder pursuant to K.R.S. § 507.020. The relevant part of the indictment charged the co-defendants with committing "the offense of Capital Murder by shooting [Norman, Durrum, Greene] with pistols when . . . [s]aid killing was intentional and the acts of the Defendants resulted in the deaths of more than one person." (TR 2). The jury convicted Halverson of Norman's murder under an accomplice instruction, meaning that the jury found that Halverson did not cause his death. The jury convicted Halverson of Durrum and Greene's murders under a combination instruction, which meant that the jury could not determine whether Halverson caused their deaths. Halverson argues that the indictment did not adequately put him on notice that he would have to formulate a defense for accomplice liability, resulting in a violation of his federal due process rights.

The Fourteenth Amendment's Due Process Clause requires that states give criminal defendants fair notice of the charges against them. *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir.1977) (citing *In re Oliver*, 333 U.S. 257, 273 (1948)). Fair notice "requires that the offense be charged with precision and certainty so as to apprise the accused of the crime

44

of which he stands charged. Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial." *Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976). Due process is satisfied so long as a defendant is given "fair notice of the charges against him to permit adequate preparation of his defense." *Williams v. Haviland*, 467 F.3d 527, 535 (6th Cir. 2006) (quoting *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984)).

Halverson cites *Lucas v. O'Dea* to support his argument. 179 F.3d 412 (6th Cir. 1999). In *Lucas*, the Sixth Circuit affirmed the district court's grant of habeas relief because the defendant was not adequately informed of his charges. *Id.* at 418. The state charged the defendant in *Lucas* with intentional murder under KRS § 507.020 for shooting a store owner during a robbery. *Id.* at 415. The jury ultimately convicted the defendant under a wanton murder instruction, which allowed the jury to return a guilty verdict even if it found that he did not "fire the shot that killed [the store owner]." *Id.* The court held that "the variance from the indictment to the jury instruction constituted a constructive amendment that deprived [the defendant] of his Fourteenth Amendment right to notice of the charges against him." *Id.* at 417 (citing *Combs*, 530 F.3d at 698).

The Sixth Circuit decided *Lucas* over a decade after Halverson's appeal and its facts are materially different. The defendant in *Lucas* was charged with intentional murder, but the jury convicted him of wanton murder. 179 F.3d at 417. Additionally, the jury instructions stated that it was "immaterial which one of [the perpetrators] fired the shot that killed [the store owner]," so long as the jury found that the defendant participated in the robbery and wantonly caused the victim's death. *Id.* at 415. The Sixth Circuit ruled this variance "sufficiently material to constitute a constructive amendment." *Id.* at 417. Here,

the grand jury charged Halverson with intentional murder and the jury found him guilty of intentional murder.  Thus, unlike in *Lucas*, the jury convicted Halverson under the level of mental culpability charged in the indictment.  The accomplice instruction did allow the jury to convict Halverson even if it found that he did not fire the shot that killed the victims.  But, unlike in *Lucas*, the jury still had to find that Halverson assisted, encouraged, and/or held himself in readiness to assist Willoughby, with the *intent* to cause the victims' deaths.  (Instructions 8 and 15).  Thus, the jury instructions in Halverson's trial more closely tracked the indictment than did the jury instructions in *Lucas*.

The Sixth Circuit has routinely rejected claims that a defendant indicted as a principal cannot be convicted as an accomplice.  *Hill v. Perini*, 788 F.2d 406, 407 (6th Cir. 1986) ("[A] defendant may be indicted for the commission of a substantive crime as a principal offender and convicted of aiding and abetting its commission although not named in the indictment as an aider and abettor without violating federal due process."); *United States v. Moore* 460 F.2d 1265, 1265 (6th Cir. 1972) (holding that it was proper for the court to give an aiding and abetting instruction when the defendant was indicted as a principal); *United States v. Lester*, 363 F.2d 68, 72 (6th Cir. 1966) (noting that "it has long been held that an indictment need not specifically charge 'aiding and abetting'").  As Sixth Circuit case law demonstrates, there is not a reasonable probability that Halverson would have prevailed on his due process claim.

Further, Kentucky case law and the indictment itself undermine Halverson's argument that he was not put on notice that the jury could convict him as an accomplice.  In *Hogan v. Commonwealth*, the Kentucky Supreme Court held that when the Commonwealth indicts multiple defendants as principals, it can convict them individually

as accomplices. 20 S.W.2d 710, 710 (Ky. 1929). And in *Neal v. Commonwealth*, the court stated that "[t]o indict both the principal and the aider and abettor as principals *gives notice* that the Commonwealth can or will attempt to prove that one did the act and the other aided and abetted." 302 S.W.2d 573, 578 (Ky. 1956) (emphasis added). In this case, the indictment accused all three defendants (Halverson, Willoughby and Hutchens), not just one of them individually, of shooting the victims and intentionally causing their deaths. Based on *Hogan* and *Neal*, that was sufficient to put Halverson on notice that the state would put on evidence that he was an accomplice and that the jury could convict him as such.

Because neither case law nor the facts support Halverson's argument that the state failed to put him on notice of the charges against him, there is not a reasonable probability that this argument would have prevailed on appeal. Halverson therefore has not demonstrated ineffective assistance of appellate counsel, and as a result has not established cause for failing to raise Claim 5 in state court. Accordingly, Claim 5 is procedurally defaulted and is denied.

### Claim 6 - Failure to instruct on EED

In Claim 6, Halverson asserts that the trial court denied him due process by not instructing the jury on extreme emotional disturbance (EED). Halverson argues that he presented sufficient EED evidence, so the trial court should have included the element in the jury instructions. Because the Kentucky Supreme Court was reasonable in determining that Halverson was not entitled to an EED instruction, Claim 6 is denied.

### A.    This claim is not procedurally defaulted

The Warden asserts that this claim is procedurally defaulted because it was not fairly

presented to the Kentucky courts. However, a review of Halverson's direct appeal brief shows that he did "assert both the factual and legal basis for" this claim. *McMeans*, 228 F.3d at 681. In Claim 12 of his direct appeal brief, which asserts denial of due process, Halverson states: "[T]he trial court did not give [Halverson] this defense of extreme emotional disturbance in either the 'principal' or the 'accomplice' murder instructions for any of the victims." (Brief for Appellant, 84-SC-39 at 125). That argument "fairly presented" the "factual and legal basis" for Claim 6 to the Kentucky Supreme Court. *See McMeans*, 228 F.3d at 681. Therefore, this Court will review Claim 6 on the merits.

**B.      State court decision**

On direct appeal, the Kentucky Supreme Court rejected Halverson's argument that the trial court should have given the jury an EED instruction:

> There was absolutely no evidence supportive of Halvorsen's complaint that the trial court should have sua sponte given the jury instructions on extreme emotional disturbance other than the bare assertion that seeing one of the victims threaten his friend, Willoughby, gives rise to a reasonable inference that he became extremely disturbed.

*Halverson*, 730 S.W. 2d at 926. The Kentucky Supreme Court again discussed the lack of EED evidence in addressing Halverson's CR 11.42 motion:

> In the instant case, Appellant failed to present any [EED] evidence. As outlined hereinabove, Appellant's evidence was merely that he turned to drugs after his divorce. Thus, this case is more akin to Slaughter v. Parker, wherein the evidence established, at most, that Slaughter panicked during the crime. Slaughter presented no evidence of mental illness or extreme emotional disturbance. The Sixth Circuit found this to be a material factor distinguishing Slaughter from Gall. A similar distinction exists in this case.

*Halvorsen*, 258 S.W.3d at 6. Because Claim 6 was clearly adjudicated on the merits, § 2254 deference applies.

**C.     Applicable law**

To determine on habeas review whether a jury instruction infringed on a defendant's

constitutional rights, a court asks "whether the instruction was erroneous and, if so, whether

the instruction 'so infected the entire trial that the resulting conviction violates due process.'"

*Clarke v. Warren*, 556 F. App'x 396, 409 (6th. Cir. 2014) (quoting *Cupp v. Naughten*, 414

U.S. 141, 147 (1973)).  Due process demands that a defendant not be convicted "except

upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for

which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).

**D.     Analysis**

EED is included in Kentucky's statutory definition of murder.  Kentucky's murder

statute, enacted in 1975, reads as follows:

> A person is guilty of murder when: (a) With intent to cause the death of
> another person, he causes the death of such person or of a third person;
> *except that in any prosecution a person shall not be guilty under this*
> *subsection if he acted under the influence of extreme emotional disturbance*
> for which there was a reasonable explanation or excuse, the
> reasonableness of which is to be determined from the viewpoint of a person
> in the defendant's situation under the circumstances as the defendant
> believed them to be. However, nothing contained in this section shall
> constitute a defense to a prosecution for or preclude a conviction of
> manslaughter in the first degree or any other crime . . .

K.R.S. § 507.020(1)(a).   While EED is included in the murder statute, at the time of

Halverson's conviction, a murder instruction did "not require the jury to find that the

defendant was not acting under the influence of [EED] unless there [was] something in the

evidence to suggest that he was."  *Gall*, 607 S.W.2d at 109.  The state had the burden of

proof on EED, but "in order to justify an instruction on the lower degree there must [have

been] something in the evidence sufficient to raise a reasonable doubt whether the

defendant is guilty of murder or manslaughter." *Id.* at 108. Therefore, the EED instruction was not automatic; for it to be included in the jury instructions there had to be some evidence that the defendant was acting under EED.

Halverson suggests that Sixth Circuit and Supreme Court case law holds that he was entitled to an EED instruction, regardless whether he presented evidence on this issue. However, Halverson cites case law indicating that he was not entitled to an EED instruction unless he presented some evidence that he was acting under the influence of EED. *See Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012) ("The Kentucky Supreme Court's decision in *Gall* . . . placed the burden of producing evidence on the defendant, but left the burden of proving the absence of [EED] with the Commonwealth *in those cases* in which the defendant had introduced evidence sufficient to raise a reasonable doubt on the issue.") (emphasis added); *Matthews v. Parker*, 651 F.3d 489, 502 (6th Cir. 2011), *reversed on other grounds by Parker*, 132 S.Ct. 2148 ("For [EED] to be included as an element of murder, Petitioner had to introduce sufficient evidence . . . to raise a reasonable doubt regarding whether he was under the influence of [EED] when he committed the crimes.").

Halverson argues that there was evidence that he was acting under EED. He points to Willoughby's testimony that Norman pointed a bayonet at Willoughby. Halverson contends that the trial court should have automatically given him an EED instruction because it gave Willoughby an EED instruction. In reviewing the Kentucky Supreme Court's resolution of this issue, it is irrelevant whether this Court "would have reached a different conclusion in the first instance." *Wood*, 558 U.S. at 309. Under § 2254, this Court can grant Halverson relief only if the Kentucky Supreme Court's ruling on this issue was unreasonable.

50

Reviewing the record, the Kentucky Supreme Court was reasonable in holding that Halverson did not produce sufficient evidence to warrant an EED instruction. Halverson did not automatically deserve the same instruction as Willoughby because he was not standing in Willoughby's shoes when he decided to start shooting. Willoughby testified that Norman pointed a bayonet at him; in contrast, there was no testimony that anyone threatened Halverson. Further, the veracity of Willoughby's claim was called into question by Hutchens's testimony that never mentioned Norman making a theat. (TE 1745). And unlike Willoughby, Halverson did not testify about his mental state at the time of the murders. Because there was no evidence that Halverson was acting under EED, the trial court's decision not to give an EED jury instruction was reasonable and did not relieve the state from proving each element of murder beyond a reasonable doubt. Therefore, Claim 6 is denied.

### Claim 7 - Ineffective assistance of counsel with respect to EED

In Claim 7, Halverson asserts that he was denied effective assistance of counsel because his trial counsel failed to request both an instruction on extreme emotional disturbance and an instruction that the jury must find that the prosecution failed to prove absence of EED beyond a reasonable doubt. Because Halverson's counsel was not unreasonable for not requesting an EED instruction, and because his counsel's decision not to request an EED instruction did not render the trial unfair, Claim 7 is denied.

### A.    State court decision

Halverson brought this claim on appeal from the trial court's denial of his CR 11.42 Motion. (Brief for Appellant, 2004-SC-17 at 32). In addressing the merits of this claim, the Kentucky Supreme Court stated:

In the instant case, Appellant failed to present any such evidence. As outlined hereinabove, Appellant's evidence was merely that he turned to drugs after his divorce. Thus, this case is more akin to Slaughter v. Parker,24 wherein the evidence established, at most, that Slaughter panicked during the crime. Slaughter presented no evidence of mental illness or extreme emotional disturbance . . . Therefore, it was not ineffective assistance of counsel for trial counsel to refrain from requesting an EED instruction based not only on the evidence, but also on the law.

*Halvorsen*, 258 S.W.3d at 10.

## B.      Applicable law

The Sixth Amendment guarantees criminal defendants the right to counsel. *Strickland*, 466 U.S. at 684.  For that reason, the Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)).  To prevail on an ineffective assistance of counsel claim, a defendant must satisfy a two-part test: (1) counsel's performance was objectively unreasonable, and (2) the unreasonable performance prejudiced the defendant.  *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* test, the defendant must demonstrate that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 687).  The Supreme Court has not articulated specific guidelines for appropriate attorney conduct, but "instead [has] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 339 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington*, 131 S.Ct. at 787.  Under the second

prong of the *Strickland* test, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Strickland*, 466 U.S. at 694. An individual has been prejudiced when his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (quoting *Strickland*, 466 U.S. at 687).

On federal habeas review, establishing ineffective assistance of counsel is "all the more difficult." *Harrington*, 131 S.Ct. at 787. In *Harrington*, the Supreme Court recently emphasized the highly deferential standard for analyzing an ineffective assistance claim on habeas review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's action were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal quotations omitted). Because the Kentucky Supreme Court adjudicated Halverson's ineffective assistance of counsel claim on the merits, the Court will review it under that deferential standard.

## C. Analysis

Halverson fails to satisfy either *Strickland* prong. First, trial counsel was not unreasonable in not requesting an EED instruction because there was no evidence to support EED. As the Kentucky Supreme Court stated in its adjudication of this claim: "In the instant case, Appellant failed to present any [EED] evidence. Appellant's evidence was merely that he turned to drugs after his divorce." *Halvorsen*, 258 S.W.3d at 6. Halverson,

nor anyone else, testified as to Halverson's mental state during the murder (at least insofar as is relevant to EED), and there was no evidence that any of the victims threatened Halverson. Because there was no evidence that Halverson was acting under EED, Halverson's trial counsel was not unreasonable for not requesting an EED instruction.

Second, it is highly unlikely that counsel's decision to not request an EED instruction prejudiced the defendant. Because there was no EED evidence, there is no reason to believe that the trial court would have granted the request. Even if the trial court had given an EED instruction, the lack of evidence makes it highly unlikely that the jury would have found Halverson was acting under EED. This is especially true since the jury found that Willoughby, who was the one supposedly threatened, was not acting under EED. Because counsel's decision to not request an EED instruction did not render the trial fundamentally unfair, Halverson has not established prejudice. *Lockhart*, 506 U.S. at 366. Halverson has not satisfied either *Strickland* prong and therefore Claim 7 is denied.

### Claim 8 - Kentucky's definition of EED

In Claim 8, Halverson argues that because Kentucky's murder statute does not define EED, it was unconstitutionally vague as applied to him, and therefore violated his due process rights. Halverson has not alleged sufficient facts demonstrating why Kentucky's murder statute left him unable to understand what conduct it prohibited, nor has he cited sufficient case law to support his argument. Therefore, Claim 8 is denied.

### A.    State court decision

The Warden argues that this claim is procedurally defaulted. However, Halverson argued on direct appeal that EED was unconstitutionally vague as it is defined in K.R.S. § 532.025(2)(b)(2). (Brief for Appellant, 84-SC-39 at 217). In that section, EED is listed as

a mitigating circumstance that must be included in the jury instructions in every case where the death penalty is authorized and the evidence supports the instruction. K.R.S. § 532.025(2)(b)(2). While a close call, Halverson's argument on appeal was sufficient to put the Kentucky state courts on notice of the factual and legal basis for Halverson's claim in this petition. *See McMeans*, 228 F.3d at 681. Further, both arguments require essentially the same legal analysis. *See Schneider v. Delo*, 85 F.3d 335 (8th Cir. 1996). Therefore, this claim is not procedurally defaulted. Further, Halverson concedes that the Kentucky Supreme Court adjudicated this claim on the merits. Accordingly, § 2254 review applies.

### B. Applicable law

Due process requires that criminal statutes be defined so "that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Staley v. Jones*, 239 F.3d 769, 791 (6th Cir. 2001) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). A criminal statute violates due process when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . . " *Connally v. General Const. Co.*, 269 U.S. 385, 291 (1926).

### C. Analysis

Halverson was convicted under K.R.S. § 507.020, which reads:

A person is guilty of murder when: (a) With intent to cause the death of another person, he causes the death of such person or of a third person; *except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance* for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or preclude a conviction of manslaughter in the first degree

or any other crime . . .

At the time of Halverson's trial, EED was not defined by statute, and the Kentucky Supreme Court had given little guidance on EED, simply stating "we know it when we see it." *Edmonds v. Commonwealth*, 586 S.W.2d 24, 27 (Ky. 1979). It was not until *McClellan v. Commonwealth*, that the Kentucky Supreme Court provided a more detailed explanation of EED and held that juries receiving an EED instruction must be given this new definition. 715 S.W.2d 464, 468-69 (Ky. 1986). The Kentucky Supreme Court later held that the *McClellan* decision was to have prospective, rather then retroactive, application. *Smith v. Commonwealth*, 734 S.W.2d 437 (Ky. 1987).

Halverson argues that *McClellan* warrants reversal of his conviction. His argument fails for two reasons. First, *McClellan* dealt with the sufficiency of jury instructions. Halverson was neither entitled to nor did he receive an EED jury instruction. Therefore, *McClellan* does not apply to Halverson. Second, *McClellan* would not entitle Halverson to relief even if it was applicable. Federal habeas courts do not grant relief based on state law questions. *Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). *McClellan* held that juries must be instructed on the state of mind that constitutes EED; it did not hold that K.R.S. § 507.020 was unconstitutionally vague. 715 S.W.2d at 469. Because *McClellan* dealt with a state law question, it cannot serve as a basis to grant Halverson relief.

The sole issue Claim 8 raises for this Court is whether K.R.S. § 507.020 was unconstitutionally vague as it applied to Halverson. Other than the bare assertion that it

failed to provide "notice of what is and what is not [EED]," Halverson offers no factual arguments in support of his claim that K.R.S. § 507.020 was unconstitutional as applied to him. And it would be a difficult argument for him to make considering he offered no EED evidence at trial. Further, whether EED should have had a more precise definition does not go to the concerns implicated by the void-for-vagueness doctrine. EED does not forbid or require the doing of an act, *see Connally*, 269 U.S. at 291; rather, it mitigates murder to manslaughter. K.R.S. § 507.020 does not leave an ordinary person guessing as to what conduct is prohibited. To the contrary, it defines precisely what is prohibited: intentionally causing the death of another person. *See Matthews*, 651 F.3d at 522 (holding that "it does not appear that the Supreme Court would consider [Kentucky's undefined EED instruction] so egregiously vague as to violate due process."). Because K.R.S. § 507.020's definition of EED was not unconstitutionally vague as applied to Halverson, Claim 8 is denied.

### Claim 9 - Halverson's conviction under the combination instruction

In Claim 9, Halverson argues that he was denied the Kentucky Constitution's guarantee of a unanimous verdict. He suggests that the jury's verdict was not unanimous because it convicted him for Durrum and Greene's murders under instructions that did not require it to determine whether Halverson was a principal or an accomplice. Halverson argues that the denial of a unanimous verdict violated his federal due process rights. Because there was sufficient evidence upon which the jury could have found Halverson guilty as a principal or an accomplice, Claim 9 is denied.

### A.    State court decision

This issue was raised by Halverson on direct appeal. The Kentucky Supreme Court rejected the argument with the following analysis:

Without merit is the contention that the instruction rendered the jury's verdict non-unanimous since it did not require the jury to indicate which crime it was finding Halvorsen or Willoughby guilty of. A verdict cannot be attacked as being non-unanimous where both theories are supported by sufficient evidence. *Wells v. Commonwealth*, 561 S.W.2d 85 (Ky. 1978). The nature of the evidence of Willoughby and Halvorsen's participation in the killing of the victims, in our opinion, amply supports either instruction. The death penalty was imposed for the murders of Greene and Durrum. These victims were shot eight and five times, respectively; three wounds on each were characterized as lethal. Two pistols of different caliber were involved. Greene had two wounds from a .38 Special and two wounds from a 9–millimeter characterized as fatal. Durrum had a fatal wound from a .38 Special and one from a 9–millimeter. Another fatal wound could not be identified as to the caliber of the gun. Thus it was impossible to determine that either appellant was only a principal or only an accomplice. The instruction conformed to the evidence.

*Halverson*, 730 S.W.2d 921. Because Claim 9 was adjudicated on the merits, AEDPA applies.

### B.    Applicable law

When there are multiple grounds for conviction, a general verdict is not invalid "because one of the possible bases of conviction was . . . unsupported by sufficient evidence." *Griffin v. United States*, 502 U.S. 46, 56 (1991). As long as one theory is supported by the evidence, "the presumption of law is that the court awarded sentence on the good count only." *Id.* at 50 (citations omitted). Jury instructions need not require jurors "to agree upon a single means of commission," because "'different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line." *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449 (1989) (Blackmun, J., concurring)).

A federal court grants habeas relief only if a person is being held in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Yet,

Halverson contends that under *Hicks v. Oklahoma*, Kentucky's guarantee of a unanimous verdict is a due process right, and therefore Kentucky law applies to his claim. 447 U.S. 343 (1980). Because it does not change the outcome, this Court will apply Kentucky law without deciding the question. In Kentucky, "when presented with alternate theories of guilt in an instruction, the Commonwealth does not have to show that each juror adhered to the same theory. Rather, the Commonwealth has to show that it has met its burden of proof under all of the alternate theories presented in the instruction." *Burnett v. Commonwealth*, 31 S.W.3d 878, 883 (Ky. 2000), *rev'd on other grounds by Travis v. Commonwealth*, 327 S.W.3d 456, 463 (Ky. 2010). When one theory is unsupported by the evidence, the jury's verdict is not unanimous. *Boulder v. Commonwealth*, 610 S.W.2d 615, 617 (Ky. 1980), *overruled on other grounds by Dale v. Commonwealth*, 715 S.W.2d 227 (Ky. 1986).

### C.    Analysis

The jury convicted Halverson for Durrum and Greene's murders under instructions 9 and 16. Those instructions allowed the jury to convict Halverson if they were "unable to determine whether he acted as a principal or accomplice in the murder of [Durrum/Greene]." (TR 250, 258). Halverson suggests that because "there is no doubt [he] delivered fatal wounds to Durrum and Greene," the jury could only find that he was an principal. (Doc. # 73 at 139). He argues that because there was no evidence that he was an accomplice, the jury's verdict was not unanimous.

After reviewing the accomplice statute and instruction, this Court disagrees with Halverson that there was not sufficient evidence for the jury to find that Halverson was an accomplice in Durrum and Greene's murders. Kentucky's accomplice liability statute, enacted in 1975, reads as follows:

(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:
    (a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
    (b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or
    (c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:
    (a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
    (b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or
    (c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

K.R.S. § 502.020. The accomplice liability instruction permitted the jury to convict Halverson for the murders of Durrum and/or Greene if they found that Willoughby intentionally killed Durrum and/or Greene, and that Halverson was present and assisted, encouraged, and/or held himself in readiness to assist Willoughby with the intent to cause Durrum and/or Greene's death. (Instructions 8 and 15).

There was sufficient evidence upon which the jury could conclude Halverson was an accomplice to Durrum and Greene's murders. Durrum and Greene each had at least one fatal wound from Halverson's gun and one fatal wound from Willoughby's gun. *Halverson*, 730 S.W.2d at 925; (TE 1552-54). There was no testimony as to who delivered the fatal wound to Durrum; there was testimony that Willoughby may have been the one to deliver the fatal wound to Greene. *Halvorsen*, 730 S.W.2d at 923 ("Hutchens then saw Willoughby shoot Greene twice more, since she was still alive."). Because there were fatal wounds to each victim from both Willoughby and Halverson's gun, but no conclusive

testimony as to who delivered *the* fatal wound, there was sufficient evidence from which a juror could have found that Halverson aided Willoughby in intentionally causing Durrum and Greene's deaths.

While the evidence supported principal and accomplice liability, this Court agrees with the Kentucky Supreme Court that it "was impossible to determine that either appellant was only a principal or only an accomplice." *Halverson*, 730 S.W.2d 921. A principal's identity is uncertain when there is "no direct evidence of who delivered the fatal blow." *United States v. Horton*, 921 F.2d 540, 544 (4th Cir. 1990). The sole eyewitness in *Horton* did not see who delivered the fatal wound, and therefore the court ruled his testimony did not "rule out the possibility that [another defendant] was the principal." *Id.* Because it was uncertain who was the actual principal, the court held it was proper to give an aiding and abetting instruction. *Id.* Likewise, because there was no direct evidence in this case whether Halverson or Willoughby discharged the fatal shot, it was proper for the court to give a combination principal-accomplice instruction. Because the evidence supported both principal and accomplice liability, the jury's verdict cannot be attacked for being non-unanimous. Accordingly, Claim 9 is denied.

### Claim 10 - Accomplice liability instruction

In Claim 10, Halverson argues that he was denied his due process right to have the prosecution prove every element of murder beyond a reasonable doubt. In support, he states that the accomplice instruction did not properly define the accomplice liability elements. Both parties state that Halverson did not bring this claim in state court. (Doc. # 73 at 143); (Doc. # 58 at 73). However, the Warden also notes that "this claim was essentially raised during the direct appeal." (Doc. # 58 at 73). The parties cannot concede

whether Claim 10 was brought in state court because that issue determines both whether this Court can review Claim 10 and whether AEDPA applies. *Moore v. Mitchell*, 708 F.3d 760, 782 (6th Cir. 2013) (noting that it is "well established that parties may not stipulate to a standard of review."). After reviewing the record, the Court determines that Halverson did bring Claim 10 on appeal and that the Kentucky Supreme Court rejected it. Therefore, the Court will review Claim 10 under § 2254 deference. Because the accomplice instruction given by the trial court sufficiently defined the elements of accomplice liability, Claim 10 is denied.

## A.    State court decision

In Halverson's direct appeal brief, he argued that the combination principal-accomplice instructions (instructions 9 and 16) violated his due process rights because "although [they] referr[ed] to [instructions 8 and 15]," they "contain[ed] no statement of the elements of the offense – murder – either for liability as a principal or an accomplice." (Brief for Appellant, 84-SC-85 at 109). In this petition, Halverson changes his argument slightly, suggesting that the accomplice liability instructions [instructions 8,15 and 18] were defective because they did not properly list the elements of accomplice liability. Thus, on direct appeal Halverson argued that the *combination instructions* (which incorporated the accomplice instructions) did not contain the elements of accomplice liability, while here he argues that the *accomplice liability instructions* did not contain the elements of accomplice liability.

While not identical, both arguments raise the same issue: Halverson was convicted of murder under instructions that did not properly list the elements of accomplice liability. Because Halverson "asserted both the factual and legal basis" for Claim 10 in his direct

appeal brief, the claim was "fairly presented" to the Kentucky Supreme Court and it is not procedurally defaulted. *McMeans*, 228 F.3d at 681. Further, the Kentucky Supreme Court clearly addressed this claim on the merits. On Halverson's direct appeal, the Court stated:

> [Halvorsen and Willoughby] complain that the "combination" instruction does not list the elements of principal or accomplice liability. This complaint is without merit since the "combination" instruction specifically refers to, and incorporates by reference, two prior instructions which consecutively listed the elements of principal and accomplice liability. Instructions are proper if, when read together and considered as a whole, they submit the law in a form capable of being understood by the jury. *Thomas v. Commonwealth*, Ky., 412 S.W.2d 578 (1967).

*Halverson*, 730 S.W.2d at 925. By determining that the combination instruction was proper, the Court necessarily determined that the accomplice liability instruction was proper. Because Claim 10 was adjudicated on the merits, this Court will apply AEDPA deference.

## B.    Applicable law

To determine on habeas review whether a jury instruction deprived a defendant of due process, a court asks "whether the instruction was erroneous and, if so, whether the instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Clarke*, 556 F. App'x at 409 (quoting *Cupp*, 414 U.S. at 147). A defendant seeking habeas relief "must show both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Clarke*, 556 F. App'x at 409 (quoting *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009)).

## C.    Analysis

Halverson argues that the trial court failed to instruct the jury on the statutory meaning of accomplice liability, and that this allowed the jury to convict Halverson without

the prosecution proving the elements of murder beyond a reasonable doubt. Resolving this issue requires analyzing the elements of accomplice liability and comparing them to the definition of accomplice liability given in the jury instructions.

K.R.S. § 502.020, enacted in 1975, reads as follows:

(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:
> (a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
> (b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or
> (c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:
> (a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
> (b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or
> (c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

Halverson's jury instructions stated that he was guilty as an accomplice to each murder if, at the time Willoughby intentionally caused the victim's death, he "was then and there present or nearby and was assisting or encouraging or holding himself in readiness to assist . . . Willoughby; and that in doing so . . . Halverson also intended to cause [the victim's] death . . ." (Instructions 8, 15 and 18). The combination instructions (9 and 16) then incorporated this definition of accomplice liability. The question for this Court is whether the Kentucky Supreme Court was unreasonable in determining that the difference between the accomplice statute and the jury instructions did not relieve the prosecution of its burden to prove murder beyond a reasonable doubt.

With regard to the *mens rea* element, the jury instructions tracked the accomplice liability statute. The accomplice liability statute requires that when causing a result is an element of an offense, the person "acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense." K.R.S. § 502.020. The instructions required the jury to find "Halverson . . . intended to cause [the victim's] death." Halverson was convicted of murder under K.R.S. § 507.020, which requires that a person intentionally cause the death of another. Thus, the trial court properly instructed the jury on the *mens rea* element of accomplice liability.

Halverson takes issue with the *actus reus* element of the accomplice liability instruction. The statute states that a person is guilty of accomplice liability if he "[s]olicits, commands, or engages in a conspiracy with such other person to commit the offense; or [a]ids, counsels, or attempts to aid such person in planning or committing the offense." K.R.S. § 502.020. The jury instructions stated Halverson was guilty if he "was then and there present or nearby and was assisting or encouraging or holding himself in readiness to assist . . . Willoughby." The difference in semantics between *soliciting*, *aiding*, *counseling* and *attempting to aid* in the statutory definition and *assisting*, *encouraging* or *holding himself ready to assist* in the jury instructions, is not so much that it relieved the prosecution of its burden of proving every element of its case beyond a reasonable doubt. *See Waddington*, 555 U.S. at 190-91.

Halverson cites recent Kentucky Supreme Court case law that encourages Kentucky trial courts to be more precise when giving accomplice liability instructions. (Doc. # 25 at 155) (citing *Beaumont v. Commonwealth*, No. 20007-SC-000486, 2009 WL 1451934 (Ky. May 21, 2009); *Hudson v. Commonwealth*, 979 S.W.2d 106, 109 (Ky. 1998); *Barbour v.*

65

*Commonwealth*, 824 S.W.2d 861, 863 (Ky. 1992)).  Those cases are no help to Halverson

for two reasons.  First, they were not the law when Halverson was convicted.  Second, they

deal with state law issues.  *Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal

habeas court to reexamine state-court determinations on state-law questions.").  Because

the Kentucky Supreme Court was reasonable in determining that the accomplice liability

instruction properly listed the elements of accomplice liability, Claim 10 is denied.

### Claim 11 - Evidence of accomplice liability

In Claim 11, Halverson argues that he was denied due process because the jury

convicted him of accomplice liability despite insufficient evidence that he acted as an

accomplice.  (Doc. #25 at 158).  He asserts that there was no evidence that he was an

accomplice in any of the three murders.  Specifically, he suggests that there is no evidence

that he aided Willoughby in causing Norman's death, and that because he shot Durrum and

Greene, he could not be convicted as an accomplice in their deaths.  Halverson never raised

this argument in state court and has not demonstrated cause for the default; therefore,

Claim 11 is denied.

### A.     Procedural default

Halverson concedes that this claim was never before the state court: "Kentucky did

not resolve [Claim 11] on its federal constitutional merits – the claim was not before it

. . . ."  (Doc. # 73 at 147).  After reviewing the record, this Court agrees.  Therefore, Claim

11 is procedurally defaulted unless cause exists to excuse the default.   To demonstrate

cause, Halverson argues ineffective assistance of appellate counsel.  Ineffective assistance

of counsel "can constitute cause under the cause and prejudice test."  *Hinkle*, 271 F.3d at

245 (citing *Lucas*, 179 F.3d at 418).  Therefore, this Court must determine if Halverson's

appellate counsel was ineffective for not raising Claim 11, which requires it to conduct a *de novo* review of Claim 11's merits. *Willis*, 351 F.3d at 745; *Werth,* 692 F.3d at 493. To prove ineffective assistance of appellate counsel, Halverson must demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

## B. Analysis

A court faced with a due process challenge to the sufficiency of the evidence asks whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard is applied "'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n. 16).

The jury convicted Halverson for Durrum and Greene's murders under a combination principal-accomplice instruction; the jury convicted Halverson for Greene's murder under an accomplice instruction. (TR 296-97). Halverson argues that while the state put on sufficient evidence that he was a principal in Durrum and Greene's murders, no evidence supported a finding that he acted as an accomplice to any of the murders. (Doc. # 25 at 158). The Kentucky Supreme Court stated the following about the evidence on accomplice liability:

> The nature of the evidence of Willoughby and Halvorsen's participation in the killing of the victims, in our opinion, amply supports either [a principal or accomplice] instruction. The death penalty was imposed for the murders of Greene and Durrum. These victims were shot eight and five times, respectively; three wounds on each were characterized as lethal. Two pistols of different caliber were involved. Greene had two wounds from a .38 Special and two wounds from a 9–millimeter characterized as fatal. Durrum had a

fatal wound from a .38 Special and one from a 9–millimeter. Another fatal wound could not be identified as to the caliber of the gun. Thus it was impossible to determine that either appellant was only a principal or only an accomplice. The instruction conformed to the evidence.

*Halverson*, 730 S.W.2d at 925.

To determine whether there is sufficient evidence that Halverson was an accomplice to murder, the Court must examine both Kentucky's accomplice liability and murder statutes.

Kentucky's accomplice liability statute, K.R.S. § 502.020, states:

> 1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:
> (a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
> (b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or
> (c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.
>
> (2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:
> (a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
> (b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or
> (c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

Kentucky's murder statute, K.R.S. § 507.020, requires the state to prove, in relevant part, that a defendant intentionally caused the death of another person. Because "a person is presumed to intend the logical and probable consequences of his actions," his state of mind "may be inferred from actions preceding and following the charged offense." *Id.* (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997)).

The Commonwealth presented abundant evidence from which a rational trier of fact could have concluded that Halverson aided Willoughby with the intent to cause Greene,

Durrum and Norman's deaths. Hutchens testified to the following: that she helped Halverson buy ammunition for his gun on the day of the shootings (TE 1736); that Halverson was holding a .38 caliber handgun when the shooting stopped (TE 1745-46); and that Halverson helped Willoughby drag the victims' bodies out of the house (TE 1749). Tucker testified that on the day of the murders Halverson admitted to killing three people. (TE 1699). Bullets from both Halverson and Willoughby's gun caused fatal injuries to Durrum and Greene. *Halverson*, 730 S.W.2d at 925; (TE 1525, 1554). Yet, there was no direct evidence as to who delivered the fatal shot to any of the victims.

Halverson is incorrect in arguing that because there is evidence that he shot Durrum and Green, the jury could not convict him as an accomplice in their deaths. To convict Halverson of accomplice liability for Durrum and Greene's murders, the state simply had to prove that Halverson aided Willoughby in intentionally causing their deaths and that either Halverson or Willoughby fired the fatal shot. *See Commonwealth v. Wolford*, 4 S.W.3d 534, 540 (Ky. 1999) (holding that for an instruction under KRS § 502.020 to be appropriate "[a]ll that is required is that the appellees agreed to act in concert to achieve a particular objective and that at least one of them fired the fatal shots."); *Gill*, 7 S.W.3d at 368-69 (noting that under an accomplice instruction, "the jury's verdict does not turn on who struck the actual fatal blow. When two like-minded souls conspire to set a fire, it does not matter who throws the gasoline and who strikes the match."). The evidence that Halverson was holding a .38 caliber handgun during the shooting and helped Willoughby drag the bodies out of the house was sufficient for a "rational tried of fact" to find Halverson guilty as an accomplice to all three murders. *Jackson*, 443 U.S. at 319. Halverson's decision to increase his level of participation by firing fatal shots at Durrum and Greene does not shield him from accomplice

liability.

Because there was overwhelming evidence that Halverson acted as an accomplice to all three murders, his appellate counsel was not unreasonable in failing to raise this claim on appeal. Further, there is not a reasonably probability that Halverson would have prevailed if his appellate counsel had raised the claim. Therefore, Halverson has not demonstrated ineffective assistance of appellate counsel. *See Smith*, 528 U.S. at 285-86. As a result, he has not established cause for failing to raise Claim 11 in state court. Accordingly, Claim 11 is denied.

### Claim 12 - Ineffective assistance of appellate counsel

Halverson argues that his appellate counsel was ineffective for not raising the arguments presented in Claims 5, 6, 8, 10 and 11 in this petition. However, this Court has already determined that Halverson's appellate counsel raised Claims 6, 8 and 10 on direct appeal. *Supra* Part IV, Claims 6, 8 and 10. The Court's conclusion that appellate counsel raised those claims obviates Halverson's argument that appellate counsel was ineffective for *not* raising them. Furthermore, this Court has already held under *de novo* review that Halverson's counsel was not ineffective for not raising Claims 5 and 11. In Claim 5 the Court held that appellate counsel was not ineffective for deciding not to argue that the state failed to put Halverson on notice of the charges against him. *Supra*, Part IV, Claim 5. And in Claim 11, the Court held that appellate counsel was not ineffective for deciding not to argue that there was insufficient evidence of accomplice liability. *Supra*, Part IV, Claim 11. In light of these conclusions, Claim 12 is denied.

### Claim 13 - Insanity defense

Halverson argues that he was denied due process because he was insane at the time

70

of the crimes.  He points to evidence that he suffers from addiction and states that due to his addiction, he was involuntarily intoxicated when he committed the murders.  Halverson asserts that this involuntary intoxication is sufficient to support an insanity defense.  Because there was no evidence before that jury that Halverson was insane at the time of the crimes, Claim 13 is denied.

### A.   Procedural default

The Warden argues that this claim is procedurally defaulted because Halverson did not raise it in state court.  Although Halverson does not cite any of his state court briefs raising the insanity issue, he argues that this claim is not procedurally defaulted because the state court addressed it on its own.  To support that argument, Halverson points to the Kentucky Supreme Court's decision on Halverson's CR 11.42 motion.  In that decision, the Kentucky Supreme Court considered whether Halverson's trial counsel was ineffective for failing to obtain an independent expert psychologist.  *Halverson*, 258 S.W.3d at 6.  In holding that Halverson's counsel was not ineffective, the Kentucky Supreme Court stated "[i]n the instant case, the evidence presented at the RCr 11.42 hearing, summarized above, is wholly insufficient to have raised an issue concerning [Halverson's] sanity."  *Id.* at 7.

To seek habeas relief on a federal claim, a petitioner must first have exhausted state remedies by presenting the claim to the state courts.  *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009).  If the petitioner did not present the claim to the state courts, it is procedurally defaulted.  *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir.2002).  The failure to present the claim in state court is excused, however, when the state court decides *sua sponte* to address the claim on its merits.  *See Schad v. Arizona*, 501 U.S. 624, 630 fn. 2 (1991); *Jones v. Dretke*, 375 F.3d 352, 354 (5th Cir. 2004) (citation omitted).  This exception

is based on AEDPA's policy that States have "'an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Jones*, 375 F.3d at 354-55 (quoting *Picard*, 404 U.S. at 275).

The Court agrees that, although Halverson did not raise the issue, the Kentucky Supreme Court addressed whether he was insane at the time of the murders. In its analysis, the court determined that Halverson's counsel was not ineffective for failing to obtain an independent expert psychologist. *Halverson*, 258 S.W.3d at 6-8. In making that determination, the court held that Halverson's case was distinguishable from *Ake v. Oklahoma*, 470 U.S. 68 (1985). *Halverson*, 258 S.W.3d at 6-8. In *Ake*, the U.S. Supreme Court ruled that when an indigent defendant makes a preliminary showing of insanity at the time of the offense, the constitution requires that the state provide a psychiatric's assistance. 470 U.S. at 74. The Kentucky Supreme Court held that *Ake* was inapplicable because there was insufficient evidence to "raise[] an issue concerning [Halverson's] sanity." *Halverson*, 258 S.W.3d at 7. Thus, in distinguishing *Ake*, the Kentucky Supreme Court addressed on the merits Halverson's sanity at the time of the murders. Therefore, this claim is not procedurally defaulted. Because it was addressed on the merits, AEDPA deference applies.

## B. Applicable law

With the insanity defense there is no "baseline for due process . . . the insanity rule . . . is substantially open to state choice." *Clark v. Arizona*, 548 U.S. 735, 752 (2006). Under Kentucky law "the jury . . . is the final arbiter of the ultimate question of the defendant's sanity (or insanity)." *Cannon v. Commonwealth*, 777 S.W.2d 591, 593 (Ky. 1989) (citing *Tunget v. Commonwealth*, 198 S.W.2d 785 (Ky. 1947)). To establish insanity, a defendant must "prove to the satisfaction of the jury that at the time the offense was

72

committed, as a result of a mental disease or defect, he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *Edwards v. Commonwealth*, 554 S.W.2d 380, 383 (Ky. 1977) (citing K.R.S. § 504.020).

### C. Analysis

Halverson argues that he was insane under Kentucky law because he was involuntarily intoxicated at the time of the murders. To demonstrate that he was involuntarily intoxicated at the time of the murders, Halverson cites to a 2002 report prepared by Dr. E. Don Nelson, who opined that "Mr. Halverson was under the influence of cocaine, valium, alcohol, marijuana, Tussinoex, and Demerol at the time of the shooting." (TR 1273). To support his argument that being involuntarily intoxicated renders one insane, Halverson cites to K.R.S. § 501.080(2), which states that involuntary intoxication can be a defense to a criminal charge. Halverson also cites *Prather v Commonwealth*, in which the Kentucky Supreme Court held that it is improper to instruct a jury that it cannot find a defendant insane based on a voluntary drug addiction. 287 S.W. 559, 560 (Ky. 1926).

None of the above-mentioned arguments support Halverson's claim. Under Kentucky law, the jury determines whether an individual is insane during the commission of an offense. *Cannon*, 777 S.W.2d at 593. Dr. Nelson's 2002 report was not available to the jury. Therefore, it cannot be used by Halverson to support his argument that the jury should have found him insane. Further, Kentucky's involuntary intoxication defense is of no help to Halverson. The jury instructions informed the jury that they could find Halverson guilty of murder only if they found that he "was *not so intoxicated* that by reason of his intoxication he did not have the intention to cause Norman, Durrum, and/or Greene's deaths." (Instructions 3, 9, 16). By finding Halverson guilty of all three murders, the jury made an

explicit finding that Halverson was not so intoxicated that he lacked the requisite intent. Finally, *Prather* does not support Halverson's claim. *Prather* held that it is improper to instruct a jury that it cannot find a person insane based on a voluntary drug addiction. 287 S.W. 559 at 560. Halverson's jury never received an insanity instruction; thus, *Prather* does not apply.

Other than testimony concerning Halverson's drug use, there is no evidence in the *trial record* upon which the jury could have found that Halverson was insane at the time of the murders. Therefore, the Kentucky Supreme Court was reasonable in concluding that there was insufficient evidence of insanity. Accordingly, Claim 13 is denied.

### Claim 14 - Ineffective assistance of counsel at the guilt phase

Halverson also claims that he received ineffective assistance of counsel at the guilt phase. He asserts that his trial counsel's performance was deficient for five reasons: (1) he failed to conduct an adequate investigation; (2) he put on an objectively unreasonable defense; (3) he failed to educate himself before deciding not to retain experts to evaluate Halverson's potential insanity or diminished capacity; (4) he undermined his own defense by eliciting testimony that Halverson shot the victims; and (5) he failed to follow through with his chosen defense. (Doc. # 25 at 196). Halverson has not demonstrated ineffective assistance of counsel with respect to the his counsel's investigation and defense. The rest of the arguments are procedurally defaulted. Accordingly, Claim 14 is denied.

### A.    Applicable law

To prevail on an ineffective assistance of counsel claim, a convicted defendant must set forth facts to satisfy a two-part test: (1) counsel's performance was objectively unreasonable, and (2) counsel's unreasonable performance prejudiced the defendant.

*Strickland*, 466 U.S. at 687. Under the first prong, courts apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S.Ct. at 787 (quoting *Strickland*, 466 U.S. at 688). Under the second prong, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. An individual has been prejudiced when his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687).

In a habeas petition, establishing ineffective assistance of counsel is "all the more difficult." *Harrington*, 131 S.Ct. at 787. In *Harrington*, the Supreme Court emphasized the highly deferential standard for analyzing an ineffective assistance claim on habeas review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's action were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal quotations omitted).

B.    **Analysis**

1.    **Failure to conduct an adequate investigation**

Halverson argues that his trial counsel was ineffective for failing to investigate possible mental health and lesser culpability defenses. Specifically, he argues that trial counsel failed to speak to his sister, friends and coworkers; to retain sufficient experts; and

to obtain his mental health and medical treatment records. Halverson asserts that an adequate investigation would have better developed the defenses of EED, duress, insanity and the inability to form the intent for murder.

### a. State court decision

Halverson raised the issue of his counsel's investigation in his CR 11.42 motion. (Brief for Appellant, 04-SC-17 at 7). The Kentucky Supreme Court addressed the prejudice prong of Halverson's argument, stating that Halverson "failed to show that any omitted investigation would have probably changed the result." *Halverson*, 258 S.W.3d at 3-4. Because the Kentucky Supreme Court adjudicated on the merits whether Halverson's counsel's investigation prejudiced him, that prong will be addressed under *Strickland* and AEDPA's deferential review.

In concluding Halverson's trial counsel's investigation did not prejudice Halverson, the Kentucky Supreme Court provided a thorough analysis:

> We first examine the RCr 11.42 testimony in the context of evidence of extreme emotional disturbance. At the time of Appellant's crimes, Kentucky law regarding extreme emotional disturbance was still in its infancy and largely undefined. Our subsequent refinement of EED jurisprudence has narrowed the circumstances which may establish EED. However, Appellant failed to present any evidence at his RCr 11.42 hearing that would have supported a finding of EED even under our earliest and most expansive interpretation of EED.
>
> Specifically, Appellant's parents, who had testified at trial, also testified at the post-conviction hearing. However, with the exception of Appellant's sister, a psychologist, and a therapist in an outpatient drug rehabilitation program, the additional witnesses who testified at the post-conviction hearing were either former co-workers or casual acquaintances, most of whom had encountered Appellant in drug-related interactions. The substance of these witnesses' testimony was cumulative and demonstrated only that after Appellant's marriage ended, he became depressed and began a downward spiral into heavy drug abuse.

Oscar "Clark" Hessell testified to Appellant's increased drug usage after his divorce. Henry Mazyck, another co-worker testified to a drastic change in Leif's character after his divorce. Buford Disponette testified that Appellant did contract work for him several years before the murders and that Appellant changed when he began doing hard drugs after his divorce. Appellant's sister, Debra Mauldin testified that Appellant became depressed when his marriage failed and he began heavy drug usage, and Susan Craft, Appellant's ex-wife, gave similar testimony.

Additional witnesses who testified at Appellant's 11.42 hearing were Dr. Eric Drogin, a psychologist and Edwin Hackney, a therapist in the Comprehensive Care Center's outpatient drug rehabilitation program. Dr. Drogin had never met Appellant and gave general testimony regarding potential avenues that should be explored to support mitigation for a defendant with a history of drug abuse. Hackney testified that Appellant had been diagnosed with substance and alcohol abuse as well as with an anti-social personality disorder while in his drug rehabilitation program, but that his treatment was terminated at the end of 1982 due to Appellant's failure to have contact with the agency since July of 1982.

Appellant's depression over his divorce and his increased drug usage were brought out at trial through the testimony of Appellant's father, a former co-worker, Jeff Luce, and through cross-examination of witnesses for the Commonwealth. Additionally, Appellant's father had testified to a recent hospital stay resulting from Appellant's drug use and to the fact that Appellant had lost his job a couple of weeks before the murders. Trial counsel introduced some of Appellant's medical records and employment records through this witness. Even assuming deficient performance by trial counsel, Appellant has not shown any prejudice. Failure to identify additional witnesses to present cumulative testimony cannot be regarded as prejudicial.

Likewise, an examination of the RCr 11.42 testimony concerning duress reveals no additional evidence that could have been presented at trial. The only RCr 11.42 testimony that even remotely relates to duress was the testimony of Darrell Bachtelle, a former co-worker, Susan Craft, Appellant's ex-wife, and Appellant himself. Bachtelle merely testified that Appellant began to change when he started hanging out with Mitchell Willoughby. Craft testified that Appellant was easily manipulated. However, Appellant, himself, testified at the penalty phase of trial that he was frightened of Willoughby and that he was acting under Willoughby's influence at the time of the murders. So, again, no additional evidence was unearthed in the RCr 11.42 proceeding that that would have supported a finding of duress. Nevertheless, Appellant argues that trial counsel should have raised the issue of Willoughby's influence over him at the guilt/innocence phase as opposed to the penalty phase. Trial counsel testified, however, that he did discuss this

possibility with Appellant, but the only way to elicit this evidence was from Appellant himself. Trial counsel testified that a strategic choice was made to keep Appellant off the stand, inter alia, so that he could argue innocence based on the fact that no one actually witnessed Appellant discharge a firearm. Furthermore, Willoughby made statements taking all the responsibility for the shootings. As such, Appellant has not overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  Duress is not a defense to intentional murder nor is it an available defense for one who intentionally or wantonly placed himself in a situation in which it was probable that he would be subjected to coercion.  Therefore, eliciting evidence of duress at the penalty phase as opposed to the guilt/innocence phase was reasonable trial strategy.

It is true that an abundance of testimony was offered at the RCr 11.42 hearing regarding Appellant's drug use. Darrell Bachtelle testified that he worked with Appellant for about two years and could not recall a time that Appellant was not under the influence of intoxicants. Clark Hessell testified that he had observed Appellant ingesting drugs including downers, Quaaludes and cocaine. Steve Meadows was a childhood friend of Appellant's who testified that when he would occasionally run into Appellant it was obvious that Appellant was on drugs. Appellant's friend, Lee Story, testified that he had witnessed Appellant smoke marijuana and inject various drugs. In addition to this testimony concerning Appellant's general drug usage, two witnesses testified that they had seen Appellant in a state of drug intoxication as recently as two weeks prior to the murders.  Buford Disponette also saw Appellant three or four days before the murders, but gave no specific testimony regarding Appellant's state of mind or appearance.  Finally, an acquaintance, Matthew Estepp, testified that he had seen both Appellant and his co-defendant Willoughby earlier the same day of the murders. Estepp stated that he saw Appellant inject liquid morphine and melted Demerol and that Estepp had purchased and injected morphine that day as well. While Estepp's testimony would have been relevant evidence of Appellant's intoxication the day of the murders, it was cumulative of testimony that was presented at trial. At trial, Willoughby testified to the drugs that he and Appellant had used the day in question. Accordingly, Appellant has not demonstrated that he was prejudiced by the failure to put on additional drug abuse evidence.

*Halvorsen*, 258 S.W.3d at 4-6.

### b.    Analysis

Halverson argues that his counsel should have called additional witnesses, including

his sister, co-workers, and friends, because they could have testified as to Halverson's drug

abuse and therefore aided in establishing either an insanity defense or a defense that Halverson could not form the *mens rea* for murder. Several witnesses testified at trial about Halverson's drug use. Jeffrey Luce, a witness who had known Halverson since the fifth grade, testified that he was with Halverson a few hours before the murder and stated that Halverson's demeanor was "funny . . . like something was wrong with him," and that Halverson "seemed kind of spacy . . . like he wasn't comprehending very quick." (TE 2134-35). Willoughy testified extensively about Halverson's drug use prior to and on the day of the murders. He testified that he was doing drugs with Halverson "pretty heavy" in the month leading up to the murders; that during that month Halverson had used demerol, morphine, cocaine, acid, and quaaludes; that the drug use picked up a few weeks before the murder; and that on the day of the murders he and Halverson had used alcohol, marijuana and cocaine. (TE 1922-45, 1960). Hutchens testified that she was doing drugs with Halverson nearly every day, and that on the day of the murders Halverson had been drinking a clear liquid and had purchased a bottle of whiskey. (TE 1728, 1756, 1770).

As the Kentucky Supreme Court recognized, the additional witnesses Halverson suggests his counsel should have called would have merely provided cumulative testimony of Halverson's drug use. *Halverson*, S.W.3d at 4. Failing to put on this cumulative evidence did not render the trial fundamentally unfair and it is not probable that doing so would have changed the result; therefore, counsel's decision not call these additional witnesses did not prejudice Halverson. *See Wong v. Belmontes*, 558 U.S. 15, 22-23 (2009) (holding that a habeas petitioner did not prove his counsel's investigation prejudiced him because, in part, the evidence the petitioner pointed to was "cumulative" and "would have offered an insignificant benefit, if any at all.") Because counsel's decision not to call additional

witnesses did not prejudice Halverson, this Court does not need to review whether that decision was unreasonable. *See Allen*, 497 Fed. Appx. at 481.

Halverson further suggests that his counsel should have sought additional expert assistance because doing so would have helped developed the defenses of EED, duress and insanity. With respect to this claim, the Kentucky Supreme Court held that trial counsel acted reasonably. *Halverson*, 258 S.W.3d at 7 ("We fail to discern how the[] facts should have reasonably alerted trial counsel of the need for additional experts."). Reviewing that holding under the deferential standard of *Strickland* and AEDPA, the Court finds that Halverson has failed to show that his attorney was deficient in consulting experts. Halverson's counsel relied on a state-appointed expert, Dr. Schwartz, who was Halverson's physician and found him competent to stand trial. *Halverson*, 258 S.W.3d at 7. Dr. Schwartz provided the following evaluation of Halverson in his competency report:

> During my examination . . . Mr. Halverson was tense, mildly depressed, and subdued. He was alert, in contact with reality, and fully oriented and showed no disturbances of behavior. There was no evidence of cognitive or perceptual dysfunction. His intellectual capacity was estimated at bright normal.

(TR 77). As the Kentucky Supreme Court noted, "[t]rial counsel testified that he relied on Dr. Schwartz's competency evaluation and simply did not believe that Dr. Schwartz's report suggested the need for any further evaluation." *Halverson*, 258 S.W.3d at 6. Counsel's decision to rely on Dr. Schwartz's testimony provides a "reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S.Ct. at 788. Therefore, the Kentucky Supreme Court's conclusion that Halverson's counsel was not deficient withstands AEDPA review.

Even if counsel was unreasonable for not consulting with further experts, Halverson has not established that the Kentucky Supreme Court was unreasonable in holding that he "failed to demonstrate any prejudice from the lack of additional experts at trial . . . ." *Halverson*, 258 S.W.3d at 7. Halverson has not shown how the help of additional experts would have resulted in a reasonable probability of success on the defenses of EED, duress, intoxication and insanity. With respect to EED, the only two witnesses who were with Halverson during the shooting (Willoughby and Hutchens) testified at trial, and they presented little to no testimony upon which a jury could have found that Halverson was acting under EED. Willoughby testified that Norman pointed a bayonet at him, but he did not testify that Halverson was threatened. Further, Halverson did not testify at to his state of mind during the shooting. Because there was no EED evidence, presenting experts on EED would have been merely academic. *See Halverson*, 258 S.W.3d at 10 ("It was not ineffective assistance of counsel for trial counsel to refrain from requesting an EED instruction based not only on the evidence, but also on the law.") Duress was inapplicable because it is not a defense to intentional murder. *Halverson*, 258 S.W.3d at 6 (citing K.R.S. § 501.090, in stating that "[t]he defense [of duress] is unavailable if the defendant intentionally or wantonly placed himself if a situation in which it was probable that he would be subjected to coercion."). Finally, with respect to intoxication and insanity because of intoxication, three witnesses testified as to Halverson's drug use and demeanor on the day of the murders. Yet, the jury's verdict found that Halverson "was *not so intoxicated* that by reason of his intoxication he did not have the intention to cause [the victims'] deaths." (Instructions 3, 9, 16). It is unlikely that additional cumulative evidence on this issue would have changed that result or been helpful. Because Halverson has not demonstrated

ineffective assistance of counsel for failure to investigate possible defenses, this part of Claim 14 is denied.

### 2. Counsel's defense

Halverson argues that his counsel put on an objectively unreasonable defense. Specifically, he suggests that it was objectively unreasonable for his counsel to argue that he did not shoot anyone. The Kentucky Supreme Court ruled that Halverson did not overcome the presumption that it was sound trial strategy for his counsel to argue innocence. *Halverson*, 258 S.W.3d at 5 (citing *Strickland*, 446 U.S. at 689). Because this *Strickland* claim was adjudicated on the merits, it receives deferential review. *Harrington*, 131 S.Ct. at 787**.**

Halverson's trial counsel made a strategic decision to argue that Halverson did not shoot anyone. *Halverson*, 258 S.W.3d at 5. As a result, he decided that Halverson should not take the stand. *Id.* This was reasonable because there was no eyewitness testimony that Halverson fired a gun. Hutchens testified that she did not see Halverson shoot anyone (TE 1797, 1818). In Willoughby's pre-trial statements he took the blame for the shootings (TE 1965), and at trial Willoughby testified that he was not sure if Halverson brought his gun with him to the murder scene (TE 2008). Willoughby further testified that the murders were not planned. (TE 1915, 1950). The question for this Court is not whether Halverson's counsel made the best decision, but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S.Ct. at 787. Because there was no eyewitness testimony that Halverson shot anyone, and because Willoughby made pretrial statements that he was solely responsible for the shootings, Halverson's counsel's decision to argue that Halverson did not shoot anyone was not objectively

unreasonable. Because counsel's decision was not objectively unreasonable, this Court does not need to review whether it prejudiced Halverson. *See Allen*, 497 F. App'x at 481. Therefore, this part of Halverson's ineffective assistance of counsel claim is denied.

### 3. Remaining Claims

Halverson's remaining claims raise the following arguments concerning his trial counsel: (1) he failed to educate himself before deciding not to retain experts to evaluate Halverson's potential insanity or diminished capacity; (2) he undermined his own defense by eliciting testimony that Halverson shot the victims; and (3) he failed to follow through with his chosen defense. (Doc. # 25 at 196). Halverson has not pointed to anywhere in his briefs below where he raised these three arguments. The Warden correctly asserts that they are therefore procedurally defaulted. Halverson has not attempted to argue cause for the default. (*See* Doc. # 73 at 170). Therefore, these three claims will not be reviewed on the merits and are denied. *Williams*, 460 F.3d at 806 (holding that failing to present a claim in state court bars a federal court from reviewing that claim on habeas).

### Claim 15 - Other act evidence

Halverson argues that he was denied his due process right to a fair trial because the prosecution elicited bad acts testimony. Halverson points to Tucker and Hutchens's testimony that he threatened to kill his mother, as well as Hutchens's testimony that he stomped on his childrens' kitten. He also challenges the prosecutor asking Willoughby whether Tucker and Hutchens had reason to lie about Halverson's threat to his mother and the prosecutor's comment in closing about the threat. Because it was not unreasonable for the Kentucky Supreme Court to determine that this testimony did not deprive Halverson of a fair trial, Claim 15 is denied.

## A.    State court decision

Halverson presented this claim to the Kentucky Supreme Court on direct appeal (Brief for Appellant, 84-SC-39 at 85-95).   In addressing the argument, the court stated:

> [T]he testimony that Halvorsen took drugs and stamped on a kitten immediately after the killing was admissible, since it was incidental to relevant testimony in regard to Halvorsen's activities between the time of the killings and the time he and Willoughby left to get rid of the victims' bodies and other evidence of the crimes. Tucker's testimony about Halvorsen's statement that he would kill his mother arose out of, and was incidental to, relevant testimony regarding Halvorsen's admission to Tucker that he and Willoughby had killed three people. This assertion of error has no merit.

*Halvorsen*, 730 S.W.2d at 926.   Halverson argues that the legal component of the claim should be reviewed *de novo* because in addressing the claim the Kentucky Supreme Court did not cite federal law.   He further argues that because the Kentucky Supreme Court did not expressly address Hutchens's testimony about Halverson's threat, that part of this claim should be reviewed *de novo*.   However, the United States Supreme Court has since rejected these arguments.   *Johnson*, 133 S.Ct. at 1096.   Halverson has not demonstrated the "unusual circumstances" needed to overcome the "strong" presumption that a federal claim denied by the state court has been adjudicated on the merits.   *Id.*   Thus, § 2254 deference applies.

## B.    Applicable law

A federal habeas court does not review whether evidence was introduced in violation of state law.   *Estelle*, 502 U.S. at 67-68; *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (holding that a habeas court does "not pass upon errors in the application of state law, especially rulings regarding the admission or exclusion of evidence.").   State evidentiary rulings are reviewed by a federal habeas court only to determine if they "violate the

petitioner's due process rights." *Coleman*, 244 F.3d at 542. An evidentiary ruling violates due process if it is "so egregious that it results in a denial of fundamental fairness." *Id.* A defendant is denied fundamental fairness when the admitted evidence is "material in the sense of a crucial, critical highly significant factor." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).

## C.    Analysis

Halverson cites to two pieces of testimony that deprived him of due process. First, he points to Tucker and Hutchens's testimony that Halverson threatened to kill his mother and the prosecutor's question to Willoughby whether he had heard Halverson say this. During her testimony, Tucker stated that when she stopped by Halverson's house on the day of the murders, she heard Halverson tell Hutchens that "he would kill [his mother] and throw her off the bridge." (TE 1701). Hutchens confirmed this during her testimony, by telling the jury that Halverson told her "I'll shoot [my mother] and throw her off the bridge." (TE 1768). The prosecutor then asked Willoughby several times whether he had heard Halverson threaten to kill his mother, to which Willoughby said he did not remember. (TE 2010-12). Second, Halverson references Hutchens's testimony that Halverson stomped on his daughter's kitten. (TE 1754-55). Both Halverson's threat that he would kill his mother and killing the kitten occurred in the time between the murders and Halverson's attempt to get rid of the victims' bodies by throwing them over a bridge. (TE 1754-55, 1768).

It was not objectively unreasonable for the Kentucky Supreme Court to conclude that the testimony Halverson cites did not deprive Halverson of a fundamentally fair trial. Testimony that Halverson threatened his mother and stomped on a kitten was certainly damaging. But it was also relevant, as it concerned Halverson's conduct immediately after

the murders and just prior to his attempt to coverup the crime. Even if the testimony was improper, it is unlikely that it had an impact on the jury's verdict. In light of the overwhelming evidence presented against Halverson, it was not unreasonable for the Kentucky Supreme Court to determine that the testimony Halverson cites in this claim was not a "crucial or critical factor in the jury's decision to convict" him. *Brown*, 227 F.3d at 642. Therefore, Claim 15 is denied.

### Claim 16 - Comment on Halverson not testifying

Halverson argues that the prosecutor violated his Fifth Amendment privilege against self-incrimination. To establish his self-incrimination claim, Halverson points to a number of questions the prosecutor asked Willoughby and suggests that the questions could be answered only if he took the stand. Halverson contends that these questions amounted to an indirect comment on his decision not to testify. Because a reasonable jury would not take these questions as comments on Halverson's decision not to testify, Claim 16 is denied.

### A.     State court decision

Halverson raised this issue on direct appeal. (Brief for Appellant, 84-SC-39 at 83-85). The Kentucky Supreme Court denied Halverson's claim, stating:

> Halvorsen complains that the prosecutor's questioning of his codefendant, Willoughby, made "oblique references" to his failure to testify and therefore constituted unfair comment on same. Willoughby was asked a number of questions about matters he had asked Halvorsen or about other witnesses' statements incriminating Halvorsen. Willoughby simply denied asking questions or could not remember. We do not consider these matters comment on failure to testify, particularly since at this stage of the trial Halvorsen had not elected to decline to take the witness stand.

*Halvorsen*, 730 S.W.2d at 925-26. Because this claim was presented to the Kentucky

Supreme Court and adjudicated on the merits, AEDPA review applies.

## B.     Applicable law

The Fifth Amendment prohibits the prosecution from commenting on a defendant's decision not to testify. *Griffin v. California*, 380 U.S. 609, 615 (1965). This includes both direct and indirect comments. *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990). Indirect comment on a defendant's decision not to testify does not warrant automatic reversal. *Id.* Rather, reversal is warranted only when the indirect comments "were manifestly intended by the prosecutor as a comment on the defendant's failure to testify or were of such a character that the jury would naturally and reasonably take them to be comments on the failure of the accused to testify." *United States v. Hines*, 398 F.3d 713, 717 (6th Cir. 2005) (quoting *Bagby*, 894 F.2d at 797-98).

## C.     Analysis

Halverson takes issue with the prosecutor's following questions: (1) whether Willoughby talked with Halverson about Hutchens's testimony that Halverson threatened his mother (TE 2011-12); (2) whether Willoughby asked Halverson why he had six .38 caliber shells in his pocket when he was arrested (TE 2017); (3) whether Halverson told Willoughby that he appreciated the statement that Willoughby gave to the police (TE 2017); (4) whether Halverson spoke with Willoughby about Tucker's testimony (TE 2019); and (5) whether Willoughby ever asked Halverson why he shot Greene four times (TE 2019). Halverson argues that these questions amounted to indirect comment on his decision not to testify because only he could have provided the answers to these questions.

Halverson contends that the Kentucky's Supreme Court's resolution of this issue was an unreasonable application of clearly established law. He supports that argument by

pointing to two parts of the court's analysis: (1) the court's reference to the fact that Halverson had not yet taken the stand; and (2) the court's noting that Willoughby either denied asking Halverson questions or said he could not remember asking them. *Halverson*, 730 S.W.2d at 925-26. Halverson makes it seem as if these were the sole reasons the Kentucky Supreme Court denied his claim. However, Halverson ignores the court's conclusion that "[w]e do not consider these matters comment on failure to testify . . . ." *Id.* at 926. Thus, the Kentucky Supreme Court applied the correct Fifth Amendment standard: if the prosecutor's questions were not comment on Halverson's failure to testify, there was no Fifth Amendment violation.

The Kentucky Supreme Court was reasonable in determining that the prosecutor's questions were not "manifestly intended by the prosecutor as a comment on Halverson's decision not to testify." *See Bagby*, 894 F.2d at 798. It appears that the prosecutor's questions were asked in an effort to either impeach Willoughby or establish Halverson's guilt. Willoughby testified that he did not remember whether Halverson had threatened to kill his mother. (TE 2011-12). The prosecutor pressed Willoughby on this point by asking him if he had talked to Halverson about Hutchens and Tucker's testimony that Halverson did make the threat. (TE 2019). Willoughby's answer could have impeached him by demonstrating that he did remember Halverson making the threat. The prosecutor's remaining questions were all asked after Willoughby admitted that he had exchanged letters with Halverson prior to trial. (TE 2016-17). These questions concerned whether Halverson had talked with Willoughby about the following: why Halverson was carrying .38 caliber bullets when he was arrested, whether Halverson appreciated Willoughby's statement to the police, and why Halverson shot Greene four times. Willoughby's potential answers could

have been strong evidence of Halverson's guilt, as they would have constituted admissions by Halverson. Therefore, it does not appear the prosecutor asked them with the intent to comment on Halverson's decision not to testify. Because the Kentucky Supreme Court reasonably concluded that the prosecutor's questions did not violate Halverson's right against self-incrimination, Claim 16 is denied.

### Claim 17 - Sentencing phase closing arguments

In Claim 17, Halverson argues that the prosecutor made comments during the sentencing phase that deprived him of due process. Specifically, Halverson challenges the prosecutor's closing statement on six grounds: (1) it incited the passions and prejudices of the jury; (2) it suggested that Halverson would have killed anyone who had been present at the scene; (3) it urged the jury to consider religion; (4) it criticized Halverson for exercising his constitutional rights; (5) it made victim impact arguments that were not based on the evidence; and (6) it told the jury that Halverson showed no remorse.

Halverson raised all of these claims, except claims three and four, on direct appeal. (Brief for Appellant, 84-SC-39 at 139-64). The Kentucky Supreme Court denied the claims, holding:

> Both Halvorsen and Willoughby complain that repeated misconduct by the prosecutor during the penalty phase closing argument deprived them of a fair trial. Our examination of the closing argument has convinced us that this complaint is without merit. Brief portions of the argument were irrelevant but on the whole, the argument was fair comment on the evidence.
>
> Considering the overwhelming nature of the evidence against Halvorsen and Willoughby, including their own admissions, we quote from *Timmons v. Commonwealth*, 555 S.W.2d 234, 241 (Ky. 1977), which concluded:
>
>> We do not think that the prosecutor's argument exceeded the bounds of propriety, nor do we think that it could have added

> much fuel to the fire anyway.

The same comment applies here.

*Halvorsen*, 730 S.W.2d at 925.

Halverson argues that § 2254 does not apply because there is no indication that the Kentucky Supreme Court addressed the federal claim. However, the United States Supreme Court rejected this argument in *Johnson v. Williams*, holding that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." 133 S.Ct. at 1096. To overcome this presumption, Halverson simply argues that the Kentucky Supreme Court did not cite federal law in its decision. That is insufficient to surmount the "strong" presumption required by *Johnson*, which can be overcome only in "unusual circumstances." *See id.* at 1096. Therefore, AEDPA deference applies to this claim.

### A.     Applicable law

A prosecutor's comments do not infringe on a defendant's constitutional rights even if they are "undesirable or even universally condemned." *Darden*, 477 U.S. at 18. Rather, they must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. When a defendant challenges a prosecutor's statements made during the sentencing phase, the Court must consider those statements against any attendant aggravating and mitigating circumstances. *Bates*, 402 F.3d at 648. Sentencing phase comments deprive a defendant of due process when they are "so egregious that they effectively 'foreclos[e] the jury's consideration of . . . mitigating evidence.'" *Id.* at 649 (quoting *DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002)).

90

When a defendant argues that a prosecutor's comments during the sentencing phase deprived him of due process, the issue is "whether the constitutional error influenced the jury's decision between life and death." *Bates*, 402 F.3d at 641. The Sixth Circuit uses a two-part test to determine whether a prosecutor's comments deprived a defendant of due process. *Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013). First, a court determines whether the comments were improper. *Id.* To do so, the court must view the comments in context. *See Beverly* 369 F.3d at 543. If improper, a court must then consider the following four factors to decide whether the comments were flagrant: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally made, and (4) the total strength of the evidence against the defendant." *Id.* (quoting *Bates*, 402 F.3d at 641). The flagrancy inquiry requires the court to consider the cumulative effect of all improper comments. *Young*, 470 U.S. at 11.

## B.     Analysis

The Court will address each of Halverson's arguments in turn, analyzing whether the Kentucky Supreme Court was objectively unreasonable in concluding that the comments were not improper; and if necessary, whether the court was objectively unreasonable in holding that the comments were not flagrant. For those claims not raised below, the Court will determine whether cause exists for the procedural default.

### 1.     Inciting the passion and prejudice of the jury

A prosecutor cannot make statements designed to "incite the passions and prejudice of the jurors." *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000). According to Halverson, the prosecutor's following comments during his sentencing phase closing argument

impermissibly incited the jury's passion and prejudice: (1) telling the jury they must send a message to the community, (2) telling the jury that the death penalty is necessary to deter others, (3) invoking the names of mass murderers, (4) suggesting Halverson would kill inmates or prison guards if sentenced to less than death, and (5) arguing Halverson could not be rehabilitated. The statement Halverson challenges is below:

> What they don't realize is that the Kentucky State Penitentiary in Eddyville is a city within a few acres, and you're not taking the person out of this world with a life sentence.

> What should we expect of an individual who has committed a ghastly act of murder and is sentenced to life? What do you expect? Do you think that he's suddenly rehabilitated upon entry into the penitentiary? He's transformed? You think that happens? Do you think that he miraculously loses his rage or his callousness and he grasps the concept somewhere in this time period that the human life is the most precious thing on earth?

> I wonder if the anti-death penalty people have ever really considered – ever really considered the welfare of hundreds of thousands of people who are subject to the risk of convicted murderers. Is the inmate population safe? The young man convicted of burglary or larceny, theft, who goes to the penitentiary, is he safe? What prevents a convicted murderer with a life sentence from getting a shiv and holding it to the kid's neck, the young burglar's neck, and demanding escape? What prevents that?

> Well, that's easy to say – the answer, segregation from prison population. Well that's fine, but what about the prison officials, people like George Coons, people who have to handle the murderer with the multiple life sentence? That's a reality. That's in the real world. Every second every person who is in this capacity of watching, of being in control, has to have a razor sharp sense of awareness in a penitentiary, because their lawness can be the opportunity, the chance, for the convicted murdered to effect his escape. That's reality.

> And his bargaining power, the throat of an innocent person whose job it is just to maintain the person. Well, our response to that person in the penitentiary, don't kill him now, Frank, because if you do we're going to give you a life sentence. Is that a deterrent to a person who's been convicted of murder, with a life sentence, multiple murders? Well I suggest to you that the death penalty is needed, much needed deterrent for the inmate population of our penal institution.

Is it conceivable to you that a convicted murderer can escape from an institution and thus subject untold numbers of innocent citizens in a community to further tragedy?  Well, I hope you understand that it is.  In the last few years, we saw Martin Luther King, the greatest black leader who ever lived, gunned down; the person caught, arrested, tried, convicted, sentenced and placed in the extremely tight security of the Tennessee maximum prison in Brushy Mountains, and he escaped, and thank God he broke his ankle when he jumped down and he was gone for three days but they finally caught him.

\*   \*   \*   \*   \*

As to the future threat of the convicted murderer to society, Gary Gilmore will never kill another college student, ever. Can the Illinois authorities guarantee that for Richard Speck? Can California authorities guarantee that about Charles Manson?

Kentucky citizens, ladies and gentlemen of the jury, have a right to be protected from any person who kills innocent people for no reason. They have a right to be guaranteed—guaranteed that a convicted murderer under our law will never kill again. That's not murder. That's protection of society.

\*   \*   \*   \*   \*

Do we want to say to this community that with a verdict of a life sentence that it's less serious because they were on drugs? I don't think so. Do we want to establish a standard with a verdict that taking the lives of three human beings is less serious because a person consumes drugs and alcohol?

\*   \*   \*   \*   \*

Understand that by your verdict you are going to set a standard as to when the death penalty should be recommended to a judge.

\*   \*   \*   \*   \*

By your verdict, do you want to set—or do you want to establish a standard whereby the value of a person's life is rendered meaningless because they took a Valium? Or because they had a stolen ring, if it was? Or because he was not kind to an employee? Do you want that standard set?

\*   \*   \*   \*   \*

Do you want to set a standard with your verdict that the death penalty is appropriate only if the victims are rich and powerful or influential?

\*   \*   \*   \*   \*

Well do you want to establish a standard in this community that you can murder three people in cold blood and have no legitimate fear of the death penalty? Do we want that standard in Lexington? A life sentence in this case tells these defendants and potential defendants that you're safe if you limit your victims to three. Well where do you draw the line in Fayette

County? Is it at five, four, five, six victims before the death penalty is appropriate.

*  *  *  *  *

Do we want to set a standard in this community where a murderer risks no greater penalty for killing an innocent witness than he risks by killing his first and second victims? Do we want that standard?

(TE 2533-37, 2550, 2558-60).

First, the Court addresses Halverson's argument that the prosecutor impermissibly told the jury that they needed to send a message and that the death penalty is necessary for deterrence. Sixth Circuit case law illustrates the permissible bounds for a prosecutor's comments regarding the death sentence and deterrence. In three cases, the Sixth Circuit Court of Appeals held that the prosecutor's comments during closing were proper. *Irick v. Bell*, 565 F.3d 315 (6th Cir. 2009); *Beuke v. Houk*, 537 F.3d 618 (6th Cir. 2008); *Hicks v. Collins*, 384 F.3d 204 (6th Cir. 2004). In *Irick*, the Sixth Circuit held that it was permissible for the prosecutor to tell the jury the following during closing:

> [W]ith your verdict, you make a statement about things whether you realize it or not. You will make a statement about the value of Paula's life. You will make a statement about what this man did and your willingness to tolerate it. You will make a statement to everybody else out there what is going to happen to people who do this sort of thing. Some of you may believe that punishment is a deterrence. Some of you may not. I don't know. I personally believe that it is.... [T]here comes a time in society when we have a right to defend ourselves. I suggest to you that it is more than a right to defend ourselves in this kind of a situation where there is a child involved. We have a duty to defend ... our families, and our homes and our children. That is what this case is about.

565 F.3d at 324-25. The Court held that the prosecutor's deterrence argument was proper because "[as of 1988], the United States Supreme Court had never held that appeals to general deterrence are impermissible in sentencing arguments." *Id.* at 325.

In *Bueke*, the court held that the prosecutor's statements were proper because they permissibly gave the jury "general background information on the death penalty and the need to punish guilty people." 537 F.3d at 647. The prosecutor "began his closing argument with broad statements about the death penalty in general, noting that 'our society will take a life' in order 'to let a message ring out' to '[c]riminals and potential criminals in this community [that] we won't tolerate this.'" *Id.* The prosecutor also told the jury that "the death penalty sends 'a message of justice[ ] to the law-abiding people in the community,' and '[t]he only way [the public] can be satisfied ... is if capital punishment is measured out.'" *Id.* In *Hicks*, the prosecutor told the jury during closing arguments that "'it is time you sent a message to the community' and 'the people in the community have the right to expect that you will do your duty.'" 384 F.3d at 219. The court held that the prosecutor's statements "were arguably proper general references to the societal need to punish guilty people," and "were not misleading, inflammatory, or prejudicial." *Id.*

In contrast to the above three cases, the Sixth Circuit held that a prosecutor's comments were "highly improper" in *Bates v. Bell.* 402 F.3d 635, 641 (6th Cir. 2005). In *Bates*, the prosecutor told the jury that they would be "accomplice[s]" to murder if they did not vote for the death penalty. *Id.* at 642. The prosecutor assured the jury that "[i]f you, based on the law and the facts of this case, choose not to execute the defendant, you have passively issued a warrant of execution for someone else." *Id.* The prosecutor then went on to say "[p]lease don't put Wayne Lee Bates back in the general population of the prison of the State of Tennessee and allow him to escape and come out and execute someone else like he executed [the victim]." *Id.* at 643. The court held that by repeatedly telling "the jurors [they] would be responsible for . . . murder[,]" and that by suggesting they would be

"accomplices" to the defendant's future crimes, the prosecutor's conduct was improper. *Id.* at 644.

Under AEDPA deference, it was not unreasonable for the Kentucky Supreme Court to determine that the prosecutor's comments in this case were not improper. Unlike the prosecutor in *Bates*, the prosecutor in this case never told the jury they would be accomplices to murder if they didn't vote for the death penalty, nor did he mention Halverson by name or tell the jury that Halverson would escape and commit further murders. By appealing to a verdict's deterrent effect, the prosecutor's comments in this case are comparable to *Irick*: "[w]ell I suggest to you that the death penalty is needed, much needed deterrent for the inmate population of our penal institution." (TE 2533-35). And as in *Beuke* and *Hicks*, the prosecutor's comments at Halverson's trial referred to the jury's duty to impose the death sentence when proper: "Kentucky citizens, ladies and gentlemen of the jury, have a right to be protected from any person who kills innocent people for no reason. They have a right to be guaranteed—guaranteed that a convicted murderer under our law will never kill again. That's not murder. That's protection of society." (TE 2537). While the prosecutor's comments may have been undesirable, they did not "infect the trial with unfairness." *Donnelly*, 416 U.S. at 643. As the Sixth Circuit noted in *Irick*, "[before 1988], the United States Supreme Court had never held that appeals to general deterrence are impermissible in sentencing arguments." 565 F.3d at 325. Therefore, it was reasonable for the Kentucky Supreme Court to decide in 1986 that the prosecutor's comments in this case were not improper.

Halverson asserts that it was improper for the prosecutor to reference James Earl Ray, Richard Speck, Gary Gilmore and Charles Manson. In support of this argument, he

points out that both the District of Columbia and the Eight Circuit Court of Appeals have held that it is improper to compare defendants to well-know mass murderers. *United States v. Phillips*, 476 F.2d 538, 538-39 (D.C. Cir. 1973); *Newlon* v. *Armontrout*, 885 F.2d 1328 (8th Cir. 1989). Halverson's argument fails for two reasons. First, neither of these cases are binding on this court and neither meets AEDPA's requirement of "clearly established" United States Supreme Court law. 28 U.S.C. § 2254. Second, the prosecutor never compared Halverson to Ray, Speck, Gilmore or Manson. Rather, he spoke about how not all of them received the death penalty and the impact that had on their ability to escape from prison. To be sure, the prosecutor never used Halverson's name during this section of his closing argument. Therefore, even if undesirable, using the above-mentioned names did not violate Halverson's due process rights.

Halverson's final two arguments relate to the prosecutor's suggestion that Halverson could not be rehabilitated and would kill inmates or prison guards if sentenced to less than death. Again, the prosecutor never mentioned Halverson by name during this part of the closing. The prosecutor spoke generally about a convicted murderer's potential for violence in prison, as well as his incentive to escape. As Halverson states in his reply, "this entire speech applied equally to anyone convicted of murder. No attempt was made to tie it to Halverson's crimes or his drug abuse." (Doc. # 73 at 239). With respect to rehabilitation, the prosecutor posed a rhetorical question: whether the jury thought murderers are suddenly rehabilitated once they enter prison. (TE 2533). These comments provide permissible "general background information on the death penalty and the need to punish guilty people," that the Sixth Circuit wrote about in *Beuke*. 537 F.3d at 647.

Even assuming *arguendo* that the prosecutor's comments were improper, they were not so flagrant so as to deny due process. The comments spanned only a few paragraphs out of nearly forty pages in the closing argument transcript. Further, the heinous nature of Halverson's crime makes it unlikely that the prosecutor's comments "influenced the jury's decision between life and death." *Bates*, 402 F.3d. Halverson, along with Willoughby, was found guilty of killing three people, binding them with rope, and throwing their bodies over a bridge. Based on the abhorrent nature of the crime, even if the prosecutor's comments were improper, it was not objectively unreasonable for the Kentucky Supreme Court to hold that they were not flagrant.

### 2.    Suggesting Halverson would have killed anyone at the scene

Halverson argues that the following statement made by the prosecutor violated his due process rights:

> But for the grace of God, there weren't any other witnesses, because Angie Greene could have been there, or Russell Durrum could have been there, or the friends of Jackie or Joey. They could have all been there. And how many victims would there have been? Do you think there would have been any spared?

(TE 2540). In support of this assertion, Halverson cites Sixth Circuit case law holding that it is improper for a prosecutor to express opinions having no basis in the record. *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999); *Bates*, 402 F.3d at 644.

Halverson's argument fails because prosecutors have "leeway to argue reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir.1996)). The evidence at trial established that Halverson and his accomplices shot and killed all other persons present at the scene. There was then testimony at trial that Halverson threatened to kill his mother if

she found out about the murder and that Halverson continued to carry his murder weapon. Thus, the evidence provided a reasonable inference that if more people were present at the murder scene, Halverson and Willoughby would have shot them as well. As a result, it was reasonable for the Kentucky Supreme Court to conclude that this statement was not improper.

### 3. The prosecutor urged the jury to consider religion

Halverson argues that the prosecutor impermissibly urged the jury to base its decision on religion. Halverson never raised this argument in state court. Therefore, it is procedurally defaulted unless he establishes cause. *Martin*, 280 F.3d at 603. To excuse the procedural default, Halverson asserts ineffective assistance of appellate counsel. Ineffective assistance of counsel "can constitute cause under the cause and prejudice test." *Hinkle*, 271 F.3d at 245 (citing *Lucas*, 179 F.3d at 418). As discussed above, that requires this Court to conduct a *de novo* review of this claim's merits. *Supra*, Part IV, Claim 5, Subpart B. To prove ineffective assistance of appellate counsel, Halverson must demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

Halverson cites the following statement made by the prosecutor:

> I've heard the argument by people expressed that they are unequivocally opposed to the death penalty and they say in support of that that we do not have the right to kill. Some of you are far better students of the Bible than I, but many Theologians say that while the Bible says thou shalt not kill, that is to be interpreted to mean thou shalt not commit murder. I ask you, in your knowledge as citizens, as students of the Bible to discuss this if that is an issue with you.

(TE 2529-30). Halverson states that it is improper for a prosecutor to urge the jury to base its sentencing decision on religion or to suggest that the jury should consider religion.

The Sixth Circuit Court of Appeals rejected a similar argument in *Coe v. Bell*. 161 F.3d 320, 351 (6th Cir. 1998). In *Coe*, the prosecutor made even stronger references to religion's role in imposing the death sentence. *Id.* In *Coe*, the prosecutor told the jury "there's certainly foundation for capital punishment in the Bible and in the scriptures themselves." *Id.* The prosecutor made specific reference to scripture by stating "[w]hosoever sheddeth man's blood, by man shall his blood be shed." *Id.* The court held that while the statements were inappropriate, they did not "constitute reversible error." *Id.* Like in *Coe*, the prosecutor in this case told the jury that the Bible *permitted* imposing the death penalty – the prosecutor did not tell the jury that it *required* it. While the prosecutor's statement may have been inappropriate, like in *Coe*, it did not rise to the level of violating Halverson's due process rights. Because this claim has no merit, Halverson's appellate counsel was not objectively unreasonable for not raising it, and appellate counsel's decision not to raise it certainly did not prejudice Halverson. Therefore, cause does not exist for the procedural default of this claim and it is denied.

### 4. Criticizing Halverson for exercising his constitutional rights

Halverson argues that the prosecutor impermissibly criticized him for exercising his constitutional rights. To support his argument, Halverson points to the prosecutor asking the following questions after he discussed the constitutional rights Halverson exercised at trial:

> What rights did the victims enjoy? Did they have attorneys? Did the victims have an impartial jury to decide their fate on Loudon Avenue? Did they have a judge to ensure that they had a fair trial? No, I'll tell you something. There sits the judge and jury and the executioner of three people.

(TE 2564-65).

Halverson never raised this argument in state court. However, Halverson has argued ineffective assistance of appellate counsel as cause to excuse the procedural default. Ineffective assistance of counsel "can constitute cause under the cause and prejudice test." *Hinkle*, 271 F.3d at 245 (citing *Lucas*, 179 F.3d at 418). As discussed above, that requires this Court to conduct a *de novo* review of this claim's merits. *Supra*, Part IV, Claim 5, Subpart B. To prove ineffective assistance of appellate counsel, Halverson must demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

The prosecutor's questions cannot be taken as criticizing Halverson for exercising his constitutional rights. The prosecutor asked the jury to consider the impact that Halverson's crime had on the victims. In doing so, he referenced the victims' constitutional rights, not Halverson's. The prosecutor did not criticize Halverson or tell the jury that they should punish Halverson for employing his constitutional rights. These statements did not "infect the trial with unfairness." *Donnelly*, 416 U.S. at 643. Because this claim has no merit, Halverson's appellate counsel was not unreasonable for not raising it, and that decision did not prejudice Halverson. Therefore, there is no cause for the procedural default of this claim and it is denied.

### 5. Victim impact argument

Halverson challenges the prosecutor's statement to the jury regarding the impact Halverson's murder had on the victims' families. He argues that the statement was improper because there was no evidence offered on that issue and therefore the prosecutor was offering his personal opinion. Below is the statement Halverson contests:

> We didn't present the parents to you in this case to talk about their child and because of that you may think that they don't cry. Don't think that for a minute. The parents of these victims can cry. I can show them to you crying. Joey Durrum's mother cries every night. Jackie Greene's mother, there's no way her tear will ever stop. No way. And do you think for a minute the parents of Joe Norman will ever forget this? You think they can wipe that out of their mind about their boy?

(TE 2563).

Even assuming *arguendo* that these comments were improper because the victims' families did not testify, it was not an unreasonable application of Supreme Court law for the Kentucky Supreme Court to hold that the comments did not violate Halverson's due process. The comments were isolated and the evidence against Halverson was strong. *See Bates*, 402 F.3d at 641. Contrary to Halverson's argument, it is unlikely that these comments incited the jury's passion and prejudice. Based on their common sense and own life experiences, the jurors would have already expected that the victims' families were grieving – irrespective of whether the prosecutor had made these comments. *See United States v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) ("Juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict . . . ."). Additionally, the prosecutor prefaced his comments by reminding the jury that the parents did not testify: "[w]e didn't present the parents to you in this case to talk about their children." (TE 2563). The prosecutor's comments revealed no information that the jury would not have already considered. Therefore, it is highly unlikely that these comments would have impacted the jury's decision whether to impose life or death. *See Bates*, 401 F.3d at 641. Accordingly, this part of Claim 17 is denied.

### 6.     Halverson showed no remorse

Finally, Halverson argues that the prosecutor impermissibly told the jury that

Halverson did not show the slightest bit of remorse and that doing so violated his right against self-incrimination. Halverson points to the following comment:

> You know we've watched these defendants – we've watched these defendants for days on end in this courtroom and we've listened to each of them explain how this callous crime occurred and not one time did we ever see the slightest hint of remorse for what they did. Not one time.

(TE 2540).

The prosecutor's statement was not improper nor did it violate Halverson's right against self-incrimination. Prosecutors have "leeway to argue reasonable inferences from the evidence." *Byrd*, 209 F.3d at 535 (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir.1996)). Once a defendant takes the stand, a prosecutor is permitted to comment on his demeanor. *Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2004) (holding that a prosecutor may comment on the defendant's demeanor if the defendant chooses to testify); *see Cunningham v. Perini*, 655 F.2d 98, 100 (6th Cir. 1981) ("Until a defendant has placed his own demeanor in evidence by taking the stand to testify, his personal appearance at the trial is irrelevant to the question of his guilt or innocence."). Halverson testified during the penalty phase. As a result, the prosecutor was entitled to argue a reasonable inference from Halverson's demeanor and tell the jury that they did not "*see* the slightest hint of remorse." This is not a comment on what Halverson did or did not say, but how he acted on the stand. Because this statement did not violate Halverson's due process or self-incrimination right, this part of Claim 17 is denied.

### Claim 18 - Individualized and reliable sentencing determination

Halverson argues that the prosecutor's allegedly improper comments during his sentencing phase deprived him of his Eighth Amendment right to an individualized and

reliable sentencing determination. He asserts that the prosecutor's comments impeded the jury's ability to consider mitigating circumstances when determining whether to impose the death penalty. To support his argument, Halverson points to the comments listed in Claim 17. *Supra,* Part IV, Claim 17. Because this claim is procedurally defaulted and Halverson has not demonstrated cause for the default, it is denied.

### A.    Procedural default

As Halverson concedes, he never raised this argument in state court. (Doc. # 73 at 214). Therefore, it is procedurally defaulted unless he establishes cause. *Martin*, 280 F.3d at 603. To excuse the procedural default, Halverson asserts ineffective assistance of appellate counsel. Ineffective assistance of counsel "can constitute cause under the cause and prejudice test." *Hinkle*, 271 F.3d at 245 (citing *Lucas*, 179 F.3d at 418). As discussed above, that requires this Court to conduct a *de novo* review of this claim's merits. *Supra*, Part IV, Claim 5, Subpart B. To prove ineffective assistance of appellate counsel, Halverson must demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

### B.    Analysis

The Eighth Amendment requires that a jury considering a death sentence not be precluded from considering mitigating factors, such as the defendant's character and the circumstances of the offense. *DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002) (citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). A prosecutor's comments can violate this requirement when they "constrain the manner in which the jury was able to give effect to mitigating evidence." *DePew*, 311 F.3d at 748 (citing *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998)).

Halverson has not established that his appellate counsel was unreasonable for deciding not to raise this claim on direct appeal. Appellant counsel is permitted to select from claims to maximize success on appeal, and only when issues not raised "are clearly stronger than the ones presented will the presumption of effective assistance of counsel be overcome." *Smith*, 528 U.S. at 288 (citation omitted). Halverson's appellate counsel raised twenty-eight issues on appeal. (Brief for Appellant, 84-SC-39). In Claim 28, appellate counsel raised the argument that the prosecutor's comments during sentencing were improper, stating that "the repeated misconduct of the prosecutor during his penalty phase denied appellant due process of law and a fair sentencing hearing." *Id* at 139. Appellate counsel cited the same prosecutor comments in that claim that Halverson cites in this claim. Thus, while brought as a due process violation and not an Eighth Amendment violation, Halverson's appellate counsel did put the issue of prosecutorial misconduct during the sentencing phase before the Kentucky Supreme Court. This is the kind of discretion appellate counsel has when "select[ing] claims to maximize success on appeal." *Smith*, 528 U.S. at 288. Arguing that the prosecutor's comments violated the Eighth Amendment is not "clearly stronger" than arguing that those same comments violated due process. Therefore, appellate counsel was not unreasonable.

Appellate counsel's decision not to raise this claim also did not prejudice Halverson. To demonstrate prejudice, Halverson argues that *Depew* is applicable and establishes that there is a reasonable probability that this claim would have been successful if raised on appeal. 311 F.3d 742. In *Depew*, the Sixth Circuit held that a prosecutor's comments violated the defendant's Eighth Amendment rights because they "undercut the defendant's sole theory of mitigation." 311 F.3d at 749-50. The defendant's mitigation theory was that

105

he had been a law-abiding and peaceful person. *Id.* at 748. During trial the prosecutor impermissibly asked a witness whether he was aware of the defendant's involvement in a knife fight, presented a picture of the defendant standing next to a marijuana plant, and told the jury in closing that the defendant did not take the stand so that the prosecutor could not ask him about a subsequent conviction. *Id.* at 748-49. *Depew* is inapplicable because, as discussed above, the prosecutor's comments here were not improper. *Supra*, Part IV, Claim 17, Subpart C(1). The prosecutor never mentioned Halverson by name, spoke generally about how inmates have the potential for violence and the desire to escape, and discussed deterrence in a manner that was acceptable in 1983. Thus, they fall on the *Irick*, *Beuke* and *Hicks* line of cases establishing prosecutorial conduct that is constitutionally permissible. *Irick v. Bell*, 565 F.3d 315 (6th Cir. 2009); *Beuke v. Houk*, 537 F.3d 618 (6th Cir. 2008); *Hicks v. Collins*, 384 F.3d 204 (6th Cir. 2004). And unlike in *Depew*, the prosecutor's comments here did not cut against Halverson's "sole theory of mitigation." 311 F.3d at 749-50. Halverson's mitigation mostly centered on his drug use; the prosecutor's comments concerned an inmate's propensity for violence and motive to escape. Halverson has not demonstrated prejudice because he has not shown that there is "a reasonable probability that" if his counsel would have raised this claim "he would have prevailed on his appeal." *Smith* 528 U.S. at 285-86 (citing *Strickland*, 466 U.S. at 694).

By failing to establish either *Strickland* prong, Halverson has failed to demonstrate that his appellate counsel was ineffective for failing to raise this claim. As a result, he has not established cause for procedural default and Claim 18 is denied.

### Claim 19 - Future dangerousness

Halverson argues that the prosecutor denied his Eighth Amendment and due process

106

rights when he argued future dangerousness during the sentencing phase without providing notice to Halverson that he would do so. Halverson challenges the same comments outlined in Claim 17. Because this claim is procedurally defaulted and Halverson has not established cause for the default, it is denied.

### A.    Procedural default

As Halverson concedes, he never raised this argument in state court. (Doc. # 73 at 226). Therefore, it is procedurally defaulted unless he establishes cause. *Martin*, 280 F.3d at 603. To excuse the procedural default, Halverson asserts ineffective assistance of appellate counsel. Ineffective assistance of counsel "can constitute cause under the cause and prejudice test." *Hinkle*, 271 F.3d at 245 (citing *Lucas*, 179 F.3d at 418). As discussed above, that requires this Court to conduct a *de novo* review of this claim's merits. *Supra*, Part IV, Claim 5, Subpart B. To prove ineffective assistance of appellate counsel, Halverson must demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

### B.    Analysis

Because this claim has no merit, Halverson's counsel was not unreasonable for deciding not to raise it, nor did that decision prejudice Halverson. First, Halverson argues that the prosecution put on evidence of his future dangerousness without providing notice as required by Kentucky law. Under K.R.S. § 532.025, "only such *evidence* in aggravation as the state has made known to the defendant prior to his trial shall be admissible." The prosecutor did not put on *evidence* of future dangerousness. Prior to closing arguments, the trial judge reminded the jury that counsel's oral argument was not testimony. (TE 2503). The prosecutor talked about how convicted murderers are dangerous and how they have

an incentive to escape; he also talked about infamous murderers but never directly compared them to Halverson. As Halverson states in his reply "this entire speech applied equally to anyone convicted of murder. No attempt was made to tie it to Halverson's crimes or his drug abuse." (Doc. # 73 at 239). The Court agrees. Because the prosecutor's comments cannot be considered *evidence* of Halverson's future dangerousness, they did not need to be disclosed to Halverson pursuant to K.R.S. § 532.025(1)(a).

Halverson cites *Ake v. Oklahoma*, *Skipper v. South Carolina* and *Simmons v. South Carolina* to support his argument that the prosecutor impermissibly put on evidence of future dangerousness. 470 U.S. 68 (1984); 476 U.S. 1 (1986); 512 U.S. 154 (1994). None of these cases are applicable here. In *Ake*, the Court held that it violated due process to deny a defendant the funds needed to rebut the state psychiatrist's testimony that the defendant posed a threat of continuing criminal violence. 470 U.S. at 88. In *Skipper*, the Court held that the defendant's Eighth Amendment rights were violated because the trial court denied the defendant the opportunity to put on mitigating evidence that he had displayed good behavior in prison. 476 U.S. at 4. In *Simmons*, the trial court refused the defendant's request that it inform the jury that he was ineligible for parole. 512 U.S. at 160. The Court held that this violated due process because the state had argued the defendant's future dangerousness, but had prevented the jury from learning that the defendant was parole ineligible. *Id.* at 171. The *Ake, Skipper* and *Simmons* line of cases establish that a defendant cannot be denied the opportunity to put on mitigating evidence during the penalty phase. These cases are inopposite because Halverson points to no evidence or argument that the trial court prohibited him from introducing to the jury.

Because this claim it is not "clearly stronger than those presented" on appeal, Halverson's counsel was not deficient. *Smith*, 528 U.S. at 288. And because this claim has no merit, Halverson has failed to demonstrate prejudice. *Id.* at 285-86 (citing *Strickland*, 466 U.S. at 694). Halverson's failure to demonstrate that his appellate counsel was deficient for not raising this claim results in his failure to establish cause for the claim's procedural default. Accordingly, Claim 19 is denied.

**Claims 20, 21 and 22 - Statutory aggravating circumstance instruction**

Halverson contends that the jury was not properly instructed on the statutory aggravating circumstance under which it imposed Halverson's death penalty. In Claim 20, Halverson argues that the instruction violated the Eighth Amendment's narrowing requirement. In Claim 21, Halverson argues that the instruction violated his due process rights. In Claim 22, Halverson asserts that, based on his interpretation of the statute, there was insufficient evidence to support the statutory aggravating circumstance. Because these claims are procedurally defaulted and Halverson has not demonstrated cause for the default, they are denied.

**A.     Procedural default**

Halverson never raised these arguments in state court. Therefore, they are procedurally defaulted unless he establishes cause. *Martin*, 280 F.3d at 603. To excuse the procedural default, Halverson asserts ineffective assistance of appellate counsel. Ineffective assistance of counsel "can constitute cause under the cause and prejudice test." *Hinkle*, 271 F.3d at 245 (citing *Lucas*, 179 F.3d at 418). As discussed above, that requires this Court to conduct a *de novo* review of the merits of these claims. *Supra*, Part IV, Claim 5, Subpart B. To prove ineffective assistance of appellate counsel, Halverson must

demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

## B. Analysis

The Supreme Court has summarized the Eighth Amendment's narrowing requirement as follows:

> To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition.

*Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (internal citations and quotations omitted).

To determine whether a jury instruction deprived a defendant of due process, a court asks "whether the instruction was erroneous and, if so, whether the instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Clarke v. Warren*, 556 F. App'x 396, 409 (6th. Cir. 2014) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

To recommend the death penalty, a Kentucky jury must find one statutory aggravating circumstance beyond a reasonable doubt. K.R.S. § 532.025(3). The jury found Halverson guilty of K.R.S. § 532.025(2)(a)(6), which allows the jury to recommend death if "[t]he offender's act or acts of killing were intentional and resulted in multiple deaths." (TR 317-18, Instruction # 68).

110

Halverson contends that the jury instructions were improper because they did not track the statutory language. Instead, the instructions read as follows:

> We the jury find that the aggravating circumstance listed in instruction [No. 54/57] has been proven from the evidence beyond a reasonable doubt; and that Leif Halverson's *acts in connection with the killing of* [Joe Durrum/Jacqueline Greene] were intentional, and also resulted in the death of Joe Norman and/or [Joe Durrum/Jacqueline Greene].

(TE 317, 318). Halverson's argument is that the instructions impermissibly substituted "*acts in connection with the killing of*" for the statutory language that reads "[t]he offender's *acts or acts of killing.*" Halverson suggests that, in giving these instructions, the trial judge changed the meaning of the statutory aggravating circumstance adopted by the Kentucky legislature. Halverson reads the statute as requiring that the jury convict him as the principal, while the instructions permitted the jury to sentence Halverson to death after finding that he was an accomplice. Halverson alleges that the deviation from the statutory language violates the Eighth Amendment's narrowing requirement and due process.

Halverson's argument fails because Kentucky treats principals and accomplices the same. Under Kentucky law, a defendant does not have to deliver the fatal blow to be guilty of killing another. *Marshall v. Commonwealth*, 60 S.W.3d 513, 518 (Ky. 2001) (citing Kentucky's accomplice liability statute, K.R.S. § 502.020, in holding that "even if the defendant, himself, did not pull the trigger, he may still be convicted of intentional murder if he was an accomplice to an offense."); *see Tharp v. Commonwealth*, 40 S.W.3d 356, 361 (Ky. 2000) ("In the context of criminal homicide, a defendant can be found guilty by complicity of an intentional homicide . . ."). Further, the Kentucky Supreme court has stated in *dicta* that an accomplice to murder can be sentenced to death. *Perdue v. Commonwealth*, 916 S.W.2d 148, 166 (Ky. 1995) ("This Court has interpreted [Supreme

Court precedent] to permit imposition of a death penalty upon *a non-trigger man* if his participation in the murder is such as to render the death penalty appropriate.") (emphasis added); *Stanford v. Commonwealth*, 854 S.W.2d 742, 744 (Ky. 1993) ("There is *no automatic exemption of the non-trigger man* from the death penalty. Rather, the circumstances of the non-trigger man's participation in the crime should be considered and, if they are of such gravity as to make the death penalty appropriate, then imposition of the death penalty is not forbidden.") (emphasis added).  K.R.S. § 532.025(2)(a)(6)'s plain language does not limit itself to principals.  Therefore, when the statute alludes to "the offender's acts or acts of killing," this Court assumes that it follows Kentucky's statutory scheme and refers to both principals and accomplices. *Petitioner F. v. Brown*, 306 S.W.3d 80, 85-86 (Ky. 2010) (recognizing that Kentucky courts read statutes in context with other parts of the law).

Based on Kentucky's statutory scheme and case law, the sentencing instructions were permissible.  The jury returned a verdict finding that Halverson intentionally killed three people by being an accomplice to Norman's death and either a principal or an accomplice in Durrum and Greene's deaths.  Thus, "[Halverson's] . . . acts of killing were intentional and resulted in multiple deaths."  K.R.S. § 532.025(2)(a)(6).  The substitution of "in connection with the killing" in the jury instructions informed the jury that, as long as they found Halverson was an accomplice to an intentional killing that resulted in multiple deaths, they could find the statutory aggravating circumstance.  Under Kentucky law that instruction was correct, and therefore did not violate Halverson's Eighth Amendment nor due process rights.

Halverson's argument in Claim 22 is that there was not sufficient evidence for the jury to find the statutory aggravating circumstance because the prosecution did not prove that

Halverson killed Durrum and Greene. As discussed in the preceding two paragraphs, all the prosecution needed to prove to establish the statutory aggravating factor was that Halverson was an accomplice to the intentional killings of Durrum and Greene and that those killings resulted in multiple deaths. This Court held in *supra* Part IV, Claim 11, that there was sufficient evidence that Halverson was an accomplice to Durrum and Greene's murders. That evidence included medical and ballistics testimony that Durrum and Greene received fatal wounds from Halverson's .38 caliber handgun, Hutchens's testimony that Halverson was holding a .38 caliber handgun when the shooting stopped, and Tucker's testimony that Halverson admitted to killing three people. It is undisputed that there was three deaths. Therefore, the evidence was sufficient for the jury to find the statutory aggravating circumstance in both Durrum and Greene's deaths.

Because Halverson's arguments regarding the jury instructions and the sufficiency of the evidence on the statutory aggravating circumstance have no merit, his appellate counsel was not objectively unreasonable for not raising them and that decision certainly did not prejudice Halverson. *See Smith*, 528 U.S. at 285-86. Because Halverson has not demonstrated cause for the procedural default of these claims, they are denied.

### Claim 23 - Decision not to put on penalty phase mitigating evidence

Halverson argues that he was denied due process when he was forced to make a choice between presenting mitigating evidence and what he claims is his right to prevent the prosecution from discussing his involvement in an unrelated crime. In support, he cites to the trial court's ruling that if he presented evidence that he had no significant history of prior criminal activity, the prosecution would be permitted to discuss his suspected involvement in Charles Murray's murder. (TE 2322-26). Because this claim is procedurally defaulted

and Halverson has not established cause for the default, it is denied.

## A.     Procedural default

Halverson never raised this argument in state court. Therefore, it is procedurally defaulted unless he establishes cause. *Martin*, 280 F.3d at 603. To excuse the procedural default, Halverson asserts ineffective assistance of appellate counsel. Ineffective assistance of counsel "can constitute cause under the cause and prejudice test." *Hinkle*, 271 F.3d at 245 (citing *Lucas*, 179 F.3d at 418). As discussed above, that requires this Court to conduct a *de novo* review of this claim's merits. *Supra*, Part IV, Claim 5, Subpart B. To prove ineffective assistance of appellate counsel, Halverson must demonstrate both that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Smith*, 528 U.S. at 285.

## B.     Analysis

To support his argument, Halverson cites to Supreme Court precedent holding that a sentencing body cannot be prevented from considering the defendant's character as a mitigating factor. *See Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). Halverson asserts that the trial judge forced him to surrender his constitutional right to not have the unindicted murder used as evidence against him. However, there is no constitutional right to prevent a sentencing body from considering prior criminal activity. *Tuilapa v. California*, 512 U.S. 967, 976-77 (1994) (holding that it is permissible for a jury to consider a defendant's criminal activity when deciding whether to impose the death penalty); *Nichols v. United States*, 511 U.S. 738, 748 (1994) (recognizing that sentencing courts can consider "a defendant's past criminal behavior, even if no conviction resulted from that behavior."); *Williams v. New York*, 37 U.S. 241, 251-52 (1949) (holding that it was permissible for a court that imposed the

death penalty to have considered crimes for which the defendant was a suspect but had not been convicted).  Contrary to Halverson's argument, the trial court did not force him to give up a constitutional right in order to present mitigating evidence that he had no significant prior criminal history.  Rather, as Halverson concedes, "[he] *chose* to not introduce evidence that he had no significant  . . . prior criminal history." (Doc. # 25 at 323).  Halverson made that choice to avoid the constitutionally permissible introduction of prior criminal acts.

Halverson presents no viable claim that his attorney could have raised on appeal.  As a result, he has not demonstrated ineffective assistance of appellate counsel and cause for the procedural default of this claim.  Therefore, this claim is denied.

### Claim 24 - Leading the jury to believe it had to impose death

In Claim 24, Halverson argues that the sentencing instructions violated his constitutional rights because they required the jury to rule out the death penalty before considering a prison term.  After filing his petition, Halverson withdrew this claim in light of the United States Supreme Court's holding in *Bobby v. Mitts*, 131 S.Ct. 1762, 1765 (2011). (Doc. #87).  In *Mitts*, the Court held that penalty phase instructions do not violate due process when they require the jury to determine whether the death penalty is warranted before determining a prison sentence.  *Id.* at 1765.  Because this is the type of instruction used at Halverson's trial, Halverson properly withdrew this claim.

### Claim 25 - Ineffective appellate counsel relating to sentencing phase issues

Halverson argues that his appellate counsel was ineffective for not raising Claims 18, 19, 20, 21, 22, 23 and 24 in this petition.  Halverson withdrew the part of this claim that alleges ineffective assistance of appellate counsel for not raising Claim 24**.**  (Doc. # 87).  The Court has already considered whether whether appellate counsel was ineffective for not

raising the remaining claims, in order to determine whether caused existed to excuse their procedural default. For each of the claims, the Court found appellate counsel was not ineffective for deciding not to raise them. *Supra*, Part IV, Claims 18, 19, 20, 21, 22, 23. Therefore, this claim is denied.

### Claim 26 - Ineffective trial counsel for failing to present mitigating evidence

Halverson argues that his trial counsel was constitutionally ineffective for failing to present mitigating evidence during the sentencing phase. He asserts that his trial counsel's investigation into the mitigation defense was ineffective because his counsel did not gather medical and mental health records, mental health or neurological evaluations, or interview his sister. He asserts that if his counsel would have conducted a more effective investigation, his counsel would have been able to present to the jury how drug abuse and exposure to industrial solvents caused him to suffer brain damage and how it impacted his behavior. Halverson suggests that if the jury would have heard this evidence it would have influenced their sentence. Because Halverson has not demonstrated that his counsel's mitigation defense prejudiced him, Claim 26 is denied.

### A.    State court decision

Halverson presented this claim to the Kentucky Supreme Court in his CR 11.42 motion. (Brief for Appellant, 2004-SC-27 at 35-28). The court's analysis is listed above. *Supra*, Part IV, Claim 17, Subpart (C)(1). Halverson argues that AEDPA deference does not apply to this claim because the trial court addressed trial counsel's guilt phase mitigation defense, but not his sentencing phase defense. After Halverson filed his petition, the United States Supreme Court rejected this type of argument, holding that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must

presume that the federal claim was adjudicated on the merits." *Johnson,* 133 S.Ct. at 1096. This presumption is a "strong one," which can be overcome only in "unusual circumstances." *Id.* Overcoming the presumption requires the petitioner to show that the state court "inadvertently overlooked" the federal claim. *See id.* 1097. Halverson has not made that showing. Because the Kentucky Supreme Court rejected Halverson's claim, this Court must presume that it was adjudicated on the merits. *Harrington*, 131 S.Ct. at 784-85. Therefore, AEDPA deference applies.

### B.      Applicable law

The Sixth Amendment guarantees criminal defendants the right to counsel. *Strickland*, 466 U.S. 668 (1984). For that reason, the Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970)). To prevail on an ineffective assistance of counsel claim, a defendant must set forth facts to satisfy a two-part test: (1) counsel's performance was objectively unreasonable, and (2) the unreasonable performance prejudiced the defendant. *Strickland*, 466 U.S. at 687.

Under the first part of the *Strickland* test, the defendant must demonstrate that "counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 687). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S.Ct. at 787. When determining whether counsel's mitigation defense was reasonable, "a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir. 2008) (citing *Wiggins*,

539 U.S. at 527). *Strickland* guides a court's analysis whether an attorney's investigation was reasonable:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.

Under the second part of the *Strickland* test, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. An individual has been prejudiced when his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart*, 506 U.S. at 369 (quoting *Strickland*, 466 U.S. at 687). When the claim is that counsel was ineffective for failing to present mitigating evidence during the sentencing phase, "[p]rejudice is established where, taken as a whole, the available mitigating evidence 'might well have influenced the [sentencer's] appraisal of [the petitioner's] moral culpability.'" *Jells*, 538 F.3d at 498 (quoting *Williams v. Taylor*, 529 U.S. 362, 398 (2000)). "There is no prejudice if the newly available evidence is merely cumulative or is not substantially different from the evidence presented during the penalty phase." *Phillips v. Bradshaw*, 607 F.3d 199, 216 (6th Cir. 2010).

On federal habeas review, establishing ineffective assistance of counsel is "all the more difficult." *Harrington*, 131 S.Ct. at 787. In *Harrington*, the Supreme Court recently

emphasized the highly deferential standard for analyzing an ineffective-assistance claim on habeas review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's action were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal quotation marks omitted). Under this deferential standard, this Court can grant habeas relief based on trial counsel's mitigation defense only if Halverson "can demonstrate a reasonable probability that, but for the alleged error of omitting certain mitigating evidence, he would not have been sentenced to death . . . [and that] the state court's conclusion was contrary to or an unreasonable application of federal law." *Phillips*, 607 F.3d at 216 (citing *Strickland*, 466 U.S. at 694).

## C. Analysis

The Court will address the prejudice prong because "it is easier to resolve, and there can be no finding of ineffective assistance of counsel without prejudice." *Phillips*, 607 F.3d at 216. Determining whether Halverson was prejudiced by his counsel's mitigation defense requires "'reweigh[ing] the evidence in aggravation against the totality of the mitigating evidence' adduced at trial and in [the] post-conviction proceeding[]." *Id.* (quoting *Wiggins*, 539 U.S. at 534-36). Because the same jury sat in both the guilt and penalty phase, the Court will consider all the evidence introduced at trial. *Harper v. Commonwealth*, 978 S.W.2d 311, 317 (Ky. 1998).

### 1. Evidence presented in mitigation

In evaluating whether Halverson was prejudiced by his counsel's mitigation defense

"it is best to begin with the evidence . . . actually presented in mitigation." *Lorraine v. Coyle*, 291 F.3d 416, 428 (6th Cir. 2002). Seven witnesses testified at trial about Halverson's drug abuse problems leading up to the murders: (1) his father, (2) his mother, (3) Luce, (4) Tucker, (5) Hutchens, (6) Willoughy, and (7) Halverson himself. Halverson's father provided the jury with general background about his son's drug problems. (TE 2394-10). He told the jury that Halverson had sought therapy for his drug issue, and described for the jury how Halverson had been taken to the emergency room due to a cocaine overdose. He testified further about how Halverson's drug problems continued in the months leading up to the murders. Halverson mother also provided testimony about her son's drug problems and how it changed his personality. (TE 2416-21). She confirmed that Halverson had attended therapy for his drug problems and testified that she would see evidence of drug use when she visited her son's house. Tucker testified that Halverson was a "pretty heavy user of drugs," and Hutchens testified that she was doing drugs with Halverson nearly every day. (TE 1707, 1728). As discussed previously, Willoughby testified in great detail about Halverson's drug use, describing the specific drugs that they used on the day before and the day of the murders. (TE 1922-45, 1960). During his penalty phase testimony, Halverson confirmed his history of drug use, including his attempted therapy and near overdose. He also admitted that his drug use accelerated prior to the murders, and that on day of the murders he smoked marijuana and drank alcohol. (TE 2428-51).

Halverson and his parents gave the jury relevant details about Halverson's life story and how he had changed in the months leading up to the murders. (TE at 2388-2410, 2413-23). Halverson's father told the jury that Halverson had married a fifteen year-old girl, then pregnant at the time with Halverson's child. While that child passed away a couple of days

after birth, Halverson's father explained that Halverson had two other children from that marriage. He told the jury that the marriage later ended in divorce and that Halverson was awarded custody of the children. He talked about Halverson's work history and how Halverson lost his job due to his drug problems. Halverson's mother testified about his divorce. She described Halverson as a good father, but stated that the drug abuse caused her to worry about the childrens' safety. She said in the months prior to the murders Halverson "seemed very depressed," and was not himself. Halverson testified that he had done the best he could to raise his children, but that the difficulty of doing so on his own led him to turn to drugs. (TE 2428).

Dr. Atcher, a psychiatrist, testified during the penalty phase about the effects of drugs. (TE 2364-75). He prefaced his testimony by explaining to the jury that he had taken "an extensive pharmacology course in medical school," and had "very specific training in drugs of abuse." Dr. Atcher described the effects of many of the drugs testimony established Halverson had taken. He explained that quaaludes and downers can cause an individual to lose his social judgment and to get involved in illegal acts. He testified that alcohol doubles or triples the effect of these drugs. He explained that cocaine can cause paranoia, which results in a person being suspicious and not able to trust others. He described how LSD causes hallucinations. Dr. Atcher also testified about withdrawal, noting that it can cause a person to be paranoid and potentially dangerous.

### 2. Additional evidence that could have been presented in mitigation

Halverson argues that his counsel should have introduced Halverson's medical records and put on expert testimony because that evidence would have impacted the jury's sentence. According to Halverson, experts could have testified that he suffered brain

damage from his drug use and was predisposed to drug abuse. He supports that argument with two reports from Drs. Nelson and Eric Drogin. He also states that an expert could have testified to brain damage suffered as a result of exposure to toxins at work. He again cites to Dr. Nelson's report in support, as well as an affidavit from a former co-worker, Clark Hessel.

After detailing Halverson's history of drug abuse, Dr. Nelson opined that Halverson was born with a genetic disposition to chemical dependency, suffered neurological damage from his drug use, and was intoxicated at the time of the murders. (TR 1273-74). In an affidavit, Dr. Nelson also stated that he would have been able to provide this testimony at the trial. (TR 1270-71). Similarly, Dr. Drogin's report states that there was evidence of Halverson's alleged neuropsychological impairment. (TR 1267). Dr. Drogin's report states that the screening instruments he used were available in 1983.

With respect to Halverson's alleged exposure to toxic chemicals at work, Dr. Nelson's report stated that Halverson was exposed to a mixture of industrial solvents and that these solvents impair judgment and mental functioning "[w]hen in the body." (TR at 1274). Clark Hessel, a former co-worker, stated in a 2002 affidavit that he and Halverson "were exposed to duct liner adhesive" that "would make me feel lightheaded and my tongue feel as if it were swollen." He stated that he and Halverson talked about the adhesive, but that they "did not think it was a big deal." (TR at 1388-90).

The Kentucky Supreme Court specifically addressed both Dr. Nelson and Dr. Drogin's reports in its adjudication of Halverson's CR 11.42 motion. In discussing Dr. Nelson's report, the court stated:

Dr. Nelson, a professor of clinical pharmacology, interviewed Appellant but his findings were, likewise, of limited utility. After recounting Appellant's history of long-term drug abuse as well as those drugs which Appellant ingested on the day of the murder, Dr. Nelson concluded that Appellant's judgment at the time of the shooting would have been impaired. He cited Appellant's inability to recall the events the morning of the murders to support the conclusion that the drugs had serious effects on his mental processes. Nevertheless, as the Commonwealth points out, Appellant was able to recall the events of the actual murders in great detail.

*Halvorsen*, 258 S.W.3d at 8. With respect to Dr. Drogin's report and his testimony at Halverson's CR 11.42 hearing, the court reached the following conclusion:

Dr. Drogin had never met Appellant and gave general testimony regarding potential avenues that should be explored to support mitigation for a defendant with a history of drug abuse.
\*\*\* \*\*\* \*\*\* \*\*\* \*\*\*
Although Dr. Drogin rendered a broad finding that there was "evidence of neuropsychological impairment, including memory deficits and other indicia of organic dysfunction" that most likely resulted from Appellant's chronic substance abuse, the finding was of limited utility as Dr. Drogin's resulting conclusion was only that more evaluation and testing were warranted. Further, Dr. Drogin described the phenomenon of "Emotional Contagion," but concluded only that administering the emotional contagion scale could shed additional insight into Appellant's susceptibility to the phenomenon. Dr. Drogin's last observation was simply that there were conflicting opinions as to whether Appellant had anti-social personality disorder.

*Id.*

### 3.  Prejudice

Were this Court evaluating Halverson's ineffective assistance claim in the first instance, it may be faced with a closer call. But on habeas review, close calls must go in favor of the state court's decision, unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). After reviewing the aggravating evidence and comparing it against the totality of the mitigating evidence presented at trial, as well as the additional mitigating evidence cited above, this

Court concludes that the Kentucky Supreme Court was reasonable in determining that the additional evidence would not have changed the jury's sentence. See *Phillips*, 607 F.3d at 216 (citing *Strickland*, 466 U.S. at 694) ("[W]e may only reverse if [the prisoner] can demonstrate a reasonable probability that, but for the alleged error of omitting certain mitigating evidence, he would not have been sentenced to death.").

The jury found Halverson guilty of K.R.S. § 532.025(2)(a)(6), an aggravating statutory circumstance that requires the jury to find that "[t]he offender's act or acts of killing were intentional and resulted in multiple deaths." (TR 317-18, Instruction # 68). The abhorrent nature of this crime is described in great detail by the Kentucky Supreme Court and cited earlier in this opinion. *Supra*, Part 1, Subpart A (citing *Halverson*, 730 S.W.3d at 922-93). To sum it up briefly, Halverson and his confederate shot and killed three individuals, at least two of whom were unarmed, tied them up with rope connected to rocks, and threw them over a bridge.

With respect to the evidence actually presented at trial, Halverson's parents painted a sufficient picture of his relevant life history at the penalty phase, including background on the following: how he lost his first child, how he went through a divorce, how drugs impacted his work life, and how drugs caused him to be depressed and affected his ability to raise his daughters. There was an abundance of evidence on Halverson's drug use, including testimony on Halverson's attempts to seek therapy, his emergency room visit due to a cocaine overdose, and his drug habits. Several witnesses also testified that Halverson's drug use increased in the time leading up the murders, and that Halverson had consumed marijuana and alcohol on the day of the murders. Finally, Dr. Atcher described the mental and psychological effects of quaaludes, downers, cocaine and LSD. Specifically, Dr. Atcher

told the jury that these drugs can cause loss of social judgment, the involvement in illegal acts, paranoia and hallucinations.

While the additional evidence may have been available for presentation in 1983, it is either cumulative or not substantially stronger than that presented. *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[T]o establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing."). Drs. Nelson and Drogin's affidavits did state that Halverson likely suffered neurological damage from drugs; however, Dr. Atcher testified extensively about the impact that drugs have on one's mental health. Dr. Nelson's affidavit opined that Halverson was under the influence at the time of the shootings; yet, the jury heard testimony from Halverson, Willoughby, Luce and Hutchens regarding Halverson's drug use and possible intoxication on the day of the murders. With respect to the toxins Halverson was exposed to at work and the impact they had on his mental capacity, the Kentucky Supreme Court observed that "Dr. Nelson stated that these solvents are known to impair judgment and mental functioning *when in the body*. However, he did not elaborate on whether they may have been in Appellant's system during the murders which was more than two weeks after Appellant had been fired from the . . . job." *Halvorsen*, 258 S.W.3d at 8 (emphasis added). As far as any medical or mental health records that trial counsel should have presented, Halverson identifies no specific information contained in those records that could have influenced the jury's decision. *See Moreland v. Bradshaw,* 699 F.3d 908, 935 (6th Cir. 2012) (holding that a habeas petitioner did not establish prejudice due to his counsel's failure to obtain medical and educational records because the petitioner left "the court to speculate about what might be included in his records and how those records

would have had any bearing on the outcome at sentencing."). The Court concludes that the totality of this additional mitigating evidence is largely "cumulative or . . . not substantially different from the evidence presented during the penalty phase." *Phillips*, 607 F.3d at 216.

Based on the foregoing, the Kentucky Supreme Court's conclusion that Halverson's trial counsel's mitigation defense did not prejudice him is not "contrary to or an unreasonable application of federal law." *Id.* at 216 (citing *Strickland*, 466 U.S. at 694). Therefore, Halverson has not demonstrated ineffective assistance of counsel and Claim 26 is denied.

### Claims 27 and 28 - Proportionality review

In Claims 27, Halverson argues that the Kentucky Supreme Court's proportionality review of his death sentence violated the Eighth Amendment for two reasons: (1) it only reviewed cases in which the death penalty had been imposed; and (2) it did not make an individualized determination of whether the death penalty is proportionate. In Claim 28, Halverson contends that Kentucky's decision to limit its proportionality review to cases where the death penalty was imposed also violates due process.

### A.     State court decision

Halverson presented both these claims on direct appeal. (Brief for Appellant, 84-SC-39 at 201-05). The court rejected Halverson's claims by holding "[w]e have reviewed the other assertions of error and are of the opinion none of them merits comment." *Halverson*, 730 S.W.2d at 928. The Kentucky Supreme Court conducted its mandatory proportionality review of Halverson's death sentence and held as follows:

> We have conducted our review of the death sentence in accordance with the provisions of KRS 532.075. We are of the opinion from the record that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. KRS 532.025(2)(a).

We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases and have in this regard considered the crimes committed here and all of the evidence surrounding Halvorsen and Willoughby and their backgrounds.

The data for our use in this regard have been compiled in accordance with KRS 532.075(6)(a), (b), and (c). We have considered all of the cases in which the death penalty was imposed after January 1, 1970, as follows: *Scott v. Commonwealth,* Ky., 495 S.W.2d 800 (1972); *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth,* Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth,* Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth,* Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth,* Ky., 491 S.W.2d 824 (1973); *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977); *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1980); *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980); *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984); *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1984); *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985); *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985); *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985); *Bevins v. Commonwealth,* Ky., 712 S.W.2d 932 (1986); *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1986); and *Marlowe v. Commonwealth,* Ky., 709 S.W.2d 424 (1986).

The cases preceding *Gall* have had the death penalty set aside for the reason the statute was invalid under *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In making a comparative study of these cases and the circumstances in this case, we are of the opinion the sentence of death here is not excessive or disproportionate to the penalty imposed in the enumerated cases.

*Id.* Based on *Harrington*, this Court presumes that the Kentucky Supreme Court's rejection of Halverson's claims resulted in an adjudication on the merits and therefore will apply AEDPA deference. 131 S.Ct. at 785.

**B.    Analysis**

Halverson argues in Claim 27 that the Kentucky Supreme Court's proportionality

127

review violated the Eighth Amendment because the court considered cases in which the death penalty was imposed, but did not consider cases in which the death penalty was not imposed. He also asserts that the court did not make an individualized determination of whether the death penalty is appropriate. Halverson's claim fails because the Eighth Amendment requires proportionality review "between the punishment and the crime"; the Eighth Amendment does not require proportionality review between the punishment handed down in one case "and that exacted in other cases." *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) (citing *Pulley v. Harris*, 465 U.S. 37, 50 (1984)). The Kentucky Supreme Court conducted a proportionality review between Halverson's death sentence and his crime, concluding the following:

> We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases *and have* in this regard considered the crimes committed here and all of the evidence surrounding Halvorsen and Willoughby and their backgrounds."

*Halverson*, 730 S.W.2d at 928. Thus, the court met the Eighth Amendment's proportionality requirement and made an individualized determination of whether the death penalty was appropriate for Halverson.

Kentucky's death penalty statute is modeled after that enacted in Georgia, which the United States Supreme Court has consistently upheld as constitutional. *McQueen v. Scroggy*, 99 F.3d 1302, 1333 (6th Cir. 1996) (citing *McCleskey v. Kemp*, 481 U.S. 279 (1987); *Zant v. Stephens*, 462 U.S. 862 (1983)*; Gregg v. Georgis*, 428 U.S. 153 (1976)). Further, the Sixth Circuit has upheld as constitutional the type of proportionality review that the Kentucky Supreme Court conducted in Halverson's case. *McQueen*, 99 F.3d at 1334; *see Getsy v. Mitchell*, 495 F.3d 295 (6th Cir. 2007) ("Since proportionality review is not

required by the Constitution, states have great latitude in defining the pool of cases used for comparison; therefore limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed falls within this wide latitude.") (internal quotation marks omitted). Based on the above cited binding precedent, the Kentucky Supreme Court's proportionality review meets constitutional muster. Therefore, Claim 27 is denied.

The Sixth Circuit has also rejected Halverson's argument in Claim 28. In *Bowling v. Parker*, the petitioner argued that "the Kentucky proportionality requirement creates a due-process interest that the Kentucky Supreme Court violated by not finding his sentence disproportionate." 344 F.3d at 521. The petitioner suggested Kentucky's review violated due process because it "compared [his] sentence to other crimes where the death penalty was imposed, but should have compared [his] sentence to similar crimes where the death penalty was not imposed." *Id.* at 522. In rejecting the petitioner's claim, the court held that "there is no violation of due process as long as Kentucky follows its procedures." *Id.* Because the *Bowling* decision is binding precedent on this Court, Claim 28 is denied.

### Claim 29 - Kentucky does not disclose its proportionality review data

In Claim 29, Halverson argues that the Kentucky Supreme Court violated his due process rights because it did not disclose the data it relied upon in affirming his death sentence. Halverson raised this claim on direct appeal, (Brief for Appellant, 84-SC-39 at 192-93), and the Kentucky Supreme Court rejected it by holding "we have reviewed the other assertions of error and are of the opinion none of them merits comment," *Halverson*, 730 S.W.2d at 923. Based on *Harrington*, this Court presumes that the Kentucky Supreme Court's rejection of Halverson's claims resulted in an adjudication on the merits and

therefore will apply AEDPA deference. 131 S.Ct. at 785.

Halverson's claim fails for two reasons.  First, as noted in above in *Supra*, Part IV, Claim 28, Subpart B, the Constitution does not require proportionality review between the sentence imposed in one case and that imposed in another.  *Bowling*, 344 F.3d at 521 (citing *Pulley*, 465 U.S. at 50).  Second, the Kentucky Supreme Court does not have a non-public data base; therefore there is nothing for the court to disclose. *See Perdue v. Commonwealth*, 916 S.W.2d 148, 168 (Ky. 1995) (stating that the Kentucky Supreme Court only uses published opinions in conducting its proportionality review).  In *Slaughter v. Parker*, 187 F.Supp.2d 755, 819-820 (W.D. Ky. 2001), former Judge Jennifer Coffman provided a thorough adjudication of this argument, holding the following:

> In sum, the time has come to put this issue to rest. The Supreme Court of Kentucky does not maintain a non-public data base. Its proportionality review, under KRS 532.075, is conducted by a review of the records of the published death penalty decisions it identifies in each of its published death penalty opinions. Discovery requests that seek to obtain such non-existence records are a waste of a petitioner's resources and those of the federal courts. The futility of such request is underscored by the repeated holdings of numerous federal courts that habeas petitioners have no federal due process rights that would entitle them to any specific procedure when a proportionality review is performed by a state court pursuant to state statute. Slaughter's arguments to the contrary border upon being specious.

This Court agrees.  Accordingly, Claim 29 is denied.

## Claim 30 - Cumulative ineffectiveness

The Court has analyzed each of Halverson's ineffective assistance of counsel claims separately, but that does not end the Court's anaylsis.  "[T]he clear mandate of *Strickland* and several other Supreme Court cases is that the effect of all counsel's errors is to be considered in toto, against the backdrop of the totality of the evidence in the case." *Mackey*

*v. Russell*, 148 F. App'x 355, 368-69 (6th Cir. 2005).

As Halverson concedes, the evidence presented against him at trial was overwhelming; and there is no doubt that the details of the crime were horrific. Halverson and Willoughby shot and killed three people, only one of whom was possibly armed. Medical and ballistics testimony established that Halverson fired fatal .38 caliber bullets into two of the victims. Halverson helped Willoughby bind all three victims with rope connected to heavy rocks, and then they attempted to toss all three victims over a bridge. When police arrived they found one victim in the river and the other two on the side of the road. Halverson confirmed these details and his participation in the crime during his penalty phase testimony.

Because this Court found no errors at Halverson's trial, there are no errors to accumulate and consider. And even if there was error, Halverson's cumulative error claim falters when weighed against the totality of the evidence. Therefore Claim 30 is denied.

## V. CERTIFICATE OF APPEALABILITY

Under the AEDPA, an appeal from a denial of a writ of habeas corpus may not be taken unless a circuit justice or judge issues a certificate of appealability. See 28 U.S.C. § 2253. Recently, in *Castro v. United States*, 310 F.3d 900 (6th Cir. 2002), the Sixth Circuit held that a district court need not wait until a petitioner moves for a Certificate of Appealability (hereinafter "COA") before issuing a COA for claims raised in the petition. Because a district judge who has recently denied a writ of habeas corpus will have "an intimate knowledge of both the record and the relevant law and could simply determine whether to issue the certificate of appealability when she denies the initial petition," it follows

that a proper time to determine whether to grant a COA is at the conclusion of the opinion granting or denying the writ. *Id.* at 901 (internal quotation marks and citations omitted).[4] Thus, in concluding this Opinion, it is now appropriate to determine whether to grant or deny a COA as to any of the claims Petitioner presented in his petition pursuant to 28 U.S.C. § 2253.

A COA may not issue unless "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.*

Applying this standard to the claims raised herein, and for the reasons set forth within the body of this Memorandum Opinion and Order, the Court concludes that because jurists of reason could debate the issues raised in Claims 1, 2, and 26, the Court will issue a COA on those claims. The Court will not issue a COA for any of the other claims raised.

## VI. CONCLUSION

For the reasons discussed above, and the Court concluding that Petitioner has presented no grounds upon which federal habeas relief is warranted, it is accordingly,

---

[4] Because *Castro* was decided subsequent to the Sixth Circuit's decision in *Murphy v. Ohio*, 263 F.2d 466 (6th Cir. 2001) wherein a different panel of the Sixth Circuit suggested that it was improper for the district court to deny a certificate of appealability before the petitioner had even applied for one, the Court believes that *Castro* is controlling and will proceed to determine which claims in Halvorsen's petition, if any, warrant a COA.

**ORDERED AS FOLLOWS**:

(1)     The petition of Leif Halverson for writ of habeas corpus (Doc. # 25) is **denied**;

(2)     Halverson's Motion to Declare 28 U.S.C § 2254(d)(1) Unconstitutional (Doc. # 27) is **denied**;

(3)     The instant action is **dismissed with prejudice** and stricken from the docket of this court;

(3)     This is a final and appealable order.  With regard to any appeal, a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b) will be **issued for Claims 1, 2, and 26**, and **denied for all other Claims raised**.

(4)     Judgment will be entered contemporaneously with this Memorandum Opinion and Order in favor of the Respondent.

This 22nd day of October, 2014.



Signed By:
*David L. Bunning*  DB
United States District Judge

B:\DATA\DeathPenalty\Halvorsen\08-484 MOO denying petition.wpd